**STATE STREET BANK AND TRUST COMPANY, Plaintiff,**

v.

**INVERSIONES ERRAZURIZ, LIMITADA (f/k/a Inversiones Errazuriz S.A.), Supermercados Unimarc S.A. (f/k/a Commercial E Inmobiliaria Unimarc S.A.), Pesquera Nacional S.A., Unimarc Abastecimientos S.A., Cidef S.A., Salmones Unimarc S.A., Industria Forestal Regional S.A., Cidef Argentina S.A., Corporación De Inversiones Y Desarrollo Financiero Cidef S.A., and Sociedad Contractual Minera Compañia De Salitre Y Yodo Primera Región (f/k/a Compañia De Salitre y Yodo Primera Primera Región S.A.), Defendants.**

No. 01 CIV. 3201(RLC).

United States District Court, S.D. New York.

Feb. 4, 2002.

Debevoise & Plimpton, New York, Joseph P. Moodhe, Of Counsel, for Plaintiff.

Law Offices of Michael B. Wolk, P.C., New York, Michael B. Wolk, Of Counsel, for Defendant.

## OPINION

ROBERT L. CARTER, District Judge.

Defendants Inversiones Errazuriz Limitada, et al., move, pursuant to F.R. Civ. P. 55(c) and 60(b), to vacate the $140 million default judgment entered against them by this court on November 21, 2001. Plaintiff State Street Bank and Trust Company opposes the motion. For the reasons set forth below, defendants' motion to vacate is denied for the time being. However, certain issues pertaining to the willfulness of the default, the merits of specific defenses advanced by defendants, and the level of prejudice plaintiff would experience if the default judgment were vacated are referred to Magistrate Judge Frank Maas for further inquiry.

## BACKGROUND

On April 16, 2001, plaintiff filed suit against defendants, in this court, seeking to recover over $100 million owed to plaintiff pursuant to two Credit Agreements executed in 1994 and 1996, respectively. (Compl. ¶ 1.) Defendants did not answer the complaint but, for several months thereafter, the parties engaged in ongoing settlement negotiations. In late June of that year, the parties even signed a stipulation extending the time to answer and acknowledging personal jurisdiction and service of process. The stipulation expired, but still the talks continued. Then, on September 28, 2001, plaintiff broke off negotiations and filed a motion for default judgment. Plaintiff requested, and received, an entry of default. The deadline to reply came and went with no word from defendants. On November 30, 2001, this court granted plaintiff's motion, entering default judgment against defendants for approximately $140 million dollars. Finally, on December 19, 2001, defendants reappeared, filing a motion to vacate the substantial default judgment entered against

them. Plaintiff opposed, bringing events to where they now stand.

## DISCUSSION

■ Since a default judgment is already in place in this case, F.R. Civ. P. 55(c) requires that defendants' motion to vacate be reviewed in accordance with the standards set forth in F.R. Civ. P. 60(b).[1] Defendants argue that this case falls under the provision of F.R. Civ. P. 60(b), which states that a default judgment may be set aside for reason of "mistake, inadvertence, surprise, or excusable neglect." In assessing a claim of excusable neglect, courts typically make three inquiries: "(1) whether the default was willful; (2) whether defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted." *Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.,* 92 F.3d 57, 59 (2d Cir.1996) (quoting *Davis v. Musler,* 713 F.2d 907, 915 (2d Cir.1983)).

■ Because it is defendants who move to vacate, they bear the burden of demonstrating that their default was not willful, that they have meritorious defenses, and that no prejudice would result from reopening the judgment. *See Sony Corp. v. Elm State Electronics, Inc.,* 800 F.2d 317, 320 (2d Cir.1986) (citing 10 Wright, Miller & Kane, *Federal Practice and Procedure* Civil 2d § 2693 at 478). This burden is not trivial: if the moving party fails to make even one of the three aforementioned showings, vacatur should be denied. *See Barnes v. Printron, Inc.,* No. 93 Civ. 5085, 1999 WL 335362, at *3 (S.D.N.Y. May 25, 1999) (Keenan, J.) ("[A] finding of willfulness obviates the need to continue the inquiry with respect [to] the existence of a meritorious defense and prejudice.").

■ Defendants' burden, however, is also eased somewhat by the countervailing consideration that "[s]trong public policy favors resolving disputes on the merits." *Am. Alliance Ins. Co., Ltd.,* 92 F.3d at 61; *see also Cody v. Mello,* 59 F.3d 13, 15 (2d Cir.1995) (collecting cases that demonstrate this Circuit's clear "preference that litigation disputes be resolved on the merits, not by default"). Given this strong preference, courts often resolve reasonable "doubts in favor of the party seeking relief from judgment to facilitate resolution of disputes on their merits." *Barnes,* 1999 WL 335362, at *3 (quoting *Corchia v. Metropolitan Life Ins. Co.,* No. 94 CIV. 7058, 1996 WL 18953, at *1 (S.D.N.Y. Jan.17, 1996) (Keenan, J.)); *see also Pecarsky v. Galaxiworld.com Ltd.,* 249 F.3d 167, 172 (2d Cir.2001). The presumption against default is particularly strong where, as here, substantial sums of money are demanded. *See Sony Corp.,* 800 F.2d at 320 (listing cases that suggest default is disfavored where large sums of money are involved).

### A. Willfulness

■ The first inquiry this court must make in assessing defendants' claim of excusable neglect is whether their default was willful. Mere negligence, even if gross, does not necessarily rise to the level of willful default. *See Am. Alliance,* 92 F.3d at 60, 61. However, no showing of bad faith on the part of the defaulting litigants is necessary to deny relief. *Gucci,* 158 F.3d at 635. And it is well settled that a default judgment should not be vacated "where the moving party ha[s] apparently made a strategic decision to default." *Am. Alliance,* 92 F.3d at 60 (citations omitted).

---

**1.** F.R. Civ. P. 55(c) states: "For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)."

In this case, defendants deny that their default was deliberate or even grossly negligent. They claim their failure to respond to plaintiff's motion was the result of an erroneous belief that Gibson Dunn & Crutcher ("Gibson Dunn"), the firm that had represented them in settlement negotiations with plaintiff, would serve as their litigation counsel as well. (*See* Defs.' Mem. at 96.) Defendants insist that, when Gibson Dunn declined to do so, they were caught completely by surprise. Their allegedly unexpected abandonment forced defendants to quest for new counsel at precisely the time they otherwise would have been opposing plaintiff's motion for default. *See Id.* To make matters worse, the first firm defendants enlisted to take over their defense, Thacher Proffitt & Wood, had to withdraw almost immediately because of a potential conflict of interest. *Id.* at 93. As a result, defendants claim they were forced yet again, through no fault of their own, to search for substitute counsel. Finally, in early November, defendants found their man in Michael B. Wolk, the attorney who represents them in the instant action. (Wolk Aff.) Mr. Wolk promptly contacted the court with news of his retainer and set about producing the massive motion to vacate filed by defendants on December 19th. By this time, however, it had been some two weeks since this court granted plaintiff's request for default judgment, and nearly three months since plaintiff first filed for the same.

While on the subject of Mr. Wolk, the court feels compelled to add a few words admonishing his conduct thus far in this case. Mr. Wolk has repeatedly tried the court's patience, submitting his initial motion late,[2] refusing to file said motion in the form ordered by the court,[3] and disrupting a court-sanctioned deposition, just to mention a few examples of his obstinate behavior. The court is mindful that Mr. Wolk has labored under difficult circumstances. However, so many of his problems have been self-imposed, the result of his inability to follow the court's clear directions.[4] Mr. Wolk is strongly advised to pay closer heed in all future interactions with the magistrate judge and this court.

Returning to the matter at hand, plaintiff predictably contests defendants' benign description of events, characterizing their default as a deliberate tactical decision designed to "buy time before being subject to a judgment ... to which they have no defense." (Pl.'s Opp'n Mem. at 8.) In support of this troubling indictment, plaintiff offers the deposition of Connor Reilly, a Gibson Dunn attorney who represented defendants during their abortive settlement negotiations with plaintiff. At first glance, Mr. Reilly's statements seem to seal the case against defendants. Particularly problematic for their account is Mr. Reilly's testimony that, as early as April 2001, he had informed defendants that his firm would not represent them in this action, and that they should seek and retain separate trial counsel. *Id.* at 5 (citing Reilly Dep. at 58–59). Plaintiff takes pains to emphasize this point, along with Mr. Reilly's assertion that he repeatedly reminded defendants, both before and af-

2. The default judgment was entered on November 30th, so the automatic 10–day stay on enforcement, pursuant to F.R. Civ. P. 62(a), expired on Friday, December 14th. Mr. Wolk submitted his motion, in an incorrect form, the following Monday, December 17th. It was not until Wednesday, December 19th, that he submitted a motion to vacate, as ordered by the court.

3. Mr. Wolk was told quite clearly that, if he wished to challenge the default judgment against defendants, he should bring a motion to vacate. Instead, he insisted upon filing an order to show cause.

4. For example, if Mr. Wolk had followed directions and filed a motion to vacate, his submission likely would not have been tardy.

ter June 2001, that the time to respond to plaintiff's complaint had expired. *Id.* (citing Reilly Dep. at 66–67).

In response, however, defendants counter with relevant evidence that resuscitates their claims. They offer detailed billing records and e-mails that establish Mr. Reilly was only one of several Gibson Dunn attorneys who worked on behalf of defendants, and that he was not even the senior partner in charge of defendants' account. (Defs.' Reply Mem. at 23 (citing Defs.' Reply Affs. and Ex. B thereto).) These points are probative because they raise the possibility that other attorneys at Gibson Dunn besides Mr. Reilly may have promised defendants the firm's litigation services, just as defendants say occurred. The aforementioned records also show that Gibson Dunn billed defendants specifically for litigation-related services on a number of occasions. Much of this litigation work was performed well after Mr. Reilly says he first informed defendants they should retain new litigation counsel. The work apparently even stretched into the immediate aftermath of September 27th, when plaintiffs served notice of their intention to seek a default judgment.[5]

Finally, defendants also provide a copy of a receipt indicating that, on October 10th, shortly after plaintiff filed for default judgment, defendants wired $200,000 to Gibson Dunn. Defendants say that shortly thereafter, Gibson Dunn abruptly severed all ties with them. While the foregoing evidence does not establish the existence of an agreement between defendants and Gibson Dunn, it does tend to corroborate defendants' good faith (if erroneous) expectation that Gibson Dunn would continue to represent their interests in litigation against plaintiff. There is thus some possibility that this erroneous expectation, coupled with their attendant inability to find a new representation, were what led to their default. If defendants were to prove that the foregoing is really what happened, this case would be substantially similar to *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 172 (2d Cir.2001) (finding that a defendant's default was not willful where its failure to appear was the result of an inability to obtain new counsel after its attorneys withdrew from the case).[6]

■ However, defendants have not, as yet, convinced the court that their default was not willful. What they have done is raise a number of questions and concerns that merit further inquiry. Given this uncertainty, the prudent solution is "to have each side make an evidentiary presentation before a magistrate and have the magistrate decide" whether the default was willful or not. *Ferraro v. Kuznetz*, 131 F.R.D. 414, 420 (S.D.N.Y.1990). Such a hearing is consistent with Rule 55(b)(2), which states:

---

**5.** A representative selection from shortly after plaintiff moved for default judgment reads:
10/11/01
  5.50  Franklin, Blake T: Teleconferences with C.D. Reilly, J.M. Trujillo regarding appearance in court; meeting with C.D. Reilly, M. Karlan to go over defenses, strategy. . . .
Similar entries refer explicitly to "Litigation." Defendants, of course, claim that Mr. Franklin (not Mr. Reilly) was the partner in charge of the matter.

**6.** *Pecarsky* technically involved a direct appeal of the entry of a default judgment, rather than

a motion to vacate like that in this case. However, the *Pecarsky* court made it clear that a default judgment (as opposed to mere entry of default) was at issue, and it reviewed the district court's decision accordingly. *See Pecarsky*, 249 F.3d at 171 ("[O]ur review of the district court's decision to grant the default judgment will examine the willfulness of default, the existence of a meritorious defense, and the possibility of prejudice to the plaintiffs should the default judgment be vacated.")

If, in order to enable the court to enter a judgment or to carry it into effect, it is necessary to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States.

F.R. Civ. P. 55(b)(2). Defendants must offer more proof than they have done thus far if they wish to convince the court that their default was not willful. However, they insist that they can, and will thus have an opportunity to do so before the magistrate judge.

### B. Meritorious Defenses

■ The court next addresses the question of whether defendants have offered potentially meritorious defenses. To qualify as meritorious, a "defense need not be ultimately persuasive at this stage. A defense is meritorious if it is good at law so as to give the factfinder some determination to make." *Am. Alliance Ins. Co., Ltd.*, 92 F.3d at 61.

#### 1. Forum Non Conveniens

■ The most obvious candidate for a meritorious defense is defendants' claim

that this case should be dismissed on grounds of forum non conveniens.[7] Pursuant to the United States Supreme Court's decisions in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Koster v. American Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), courts confronted with a claim of forum non conveniens apply a two-step inquiry. The first step is to determine if an adequate alternative forum exists. *See, e.g., Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Gilbert*, 330 U.S. at 506–07, 67 S.Ct. 839. If one does, courts must then balance a series of public and private factors to decide which of the competing fora is more appropriate for resolution of the dispute. *See, e.g., Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839. The defendant bears the burden of establishing both that an adequate alternative forum exists and that the pertinent factors "tilt[ ] strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir.1991). "The plaintiff's choice of forum should rarely be disturbed." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839.

In this case, plaintiff does not challenge the adequacy of the alternative forum in Chile. Thus the real question is which forum do the public and private factors favor, bearing in mind the proper defer-

---

7. Defendants actually portray their forum non conveniens argument as a "threshold jurisdictional" issue, arguing that even if this court has jurisdiction over the dispute, "the federal application of forum doctrine *precludes* the Court from exercising that jurisdiction." (Defs.' Mem. at 7 (emphasis in original).) However, the doctrine is clearly a discretionary one. *See, e.g., Wiwa v. Royal Dutch Petroleum, Co.*, 226 F.3d 88, 100(2d Cir.2000)("[F]orum non conveniens is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.") (quotations omitted).

Moreover, forum non conveniens is a subset of venue, which courts have taken pains to distinguish from jurisdiction. *See, e.g., Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167–68, 60 S.Ct. 153, 84 L.Ed. 167; Wright, Miller & Cooper, *Federal Practice and Procedure* Jurisdiction 2d § 3828 ("Venue is sometimes confused with jurisdiction. This ought not happen, for the two concepts are quite different."). Thus defendants' claim does not raise any jurisdictional issue, and is instead properly considered as part of the inquiry into whether they have raised a meritorious defense.

ence to plaintiff's preference for New York. Regarding this latter issue, defendants urge the court to accord "very slight, if any" deference in light of the Second Circuit's recent decision in *Iragorri v. United Tech. Corp.*, 274 F.3d 65 (2d Cir. 2001). (Defs.' Mem. at 27.) According to defendant, *Iragorri* stands for the proposition that courts should "not accord any significant deference to an American plaintiff who sues in a federal district which is *outside* the district in which [the plaintiff resides]." *Id.* at 25–26 (emphasis in original). Defendants further suggest that the decision of plaintiff, a Massachusetts company, to bring suit in the Southern District of New York may constitute prime facie evidence of forum shopping. *Id.* at 26.

However, defendants misapprehend the Second Circuit's holding in *Iragorri*. The *Iragorri* court expressly rejected the stance taken by defendants in this case. *Iragorri*, 274 F.3d at 73 ("It is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district."). In fact, the result in *Iragorri* was to overturn the decision of the district court, which had applied a rationale similar to defendants' in dismissing a lawsuit on grounds of forum non conveniens. In remanding the case for reconsideration, the Second Circuit stated: "We believe that the District Court in the case before us . . . did not accord appropriate deference to the plaintiff's chosen forum." *Id.* at 75.

This reading of *Iragorri* is consistent with other cases decided recently by the Second Circuit, and referenced in *Iragorri* with approval. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 103 (2d Cir.2000) ("The district court weighed against the plaintiffs that none of them were residents of the Southern District of New York but did not count in favor of their choice of a U.S. forum that two of them were residents of the United States. This was error."); *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir.2000) ("[I]n a forum non conveniens case involving a foreign court, the 'home forum' for the [U.S.] plaintiff is any federal district in the United States, not the particular district where the plaintiff lives.") (quotations omitted).

The whole point of these decisions is to place the burden upon the defendant to show that a plaintiff, who files suit outside his district of residence, is doing so for strategic reasons. Defendants offer no compelling evidence, beyond breathless and conclusory allegations of hostile juries and unfavorable legal regimes, to demonstrate that this particular plaintiff has engaged in the sort of forum shopping frowned upon by the Second Circuit.[8] What is more, defendants' analysis fails to account for the most obvious reason plaintiff filed suit in this District: the Credit Agreements, with their forum selection clauses, made it reasonable for plaintiff to believe that defendants would be more amenable to suit in New York than anywhere else. *See Iragorri*, 274 F.3d at 73 ("Where a U.S. resident leaves her home district to sue the defendant where the defendant has established itself and is thus amenable to suit, this would not ordinarily indicate a choice motivated by desire to impose tactical disadvantage on the defendant.").[9] In light of these considerations,

---

8. Indeed, the court notes that many of the factors cited by defendants, such as the high cost of travel to and from this country, apply equally in reverse. That is, moving this case to Chile would simply impose upon plaintiff precisely the same inconveniences that defendants decry in their motion.

9. In fact, plaintiff's assumption proved correct. In June 2001, defendants signed a stipulation consenting to personal jurisdiction and service of process.

the court finds that defendants have not met their burden of demonstrating that the presumption in favor of plaintiff's choice of forum should be diminished in this case.

The aforementioned forum selection clauses also have significance for a related but distinct dispute over whether the Credit Agreements confer exclusive or non-exclusive jurisdiction on New York courts. If it is the former, then defendants' forum non conveniens argument is defeated unless they can show "that trial will be so gravely difficult and inconvenient that [they] will for all practical purposes be deprived of [their] day in court." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 18, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). If it is the latter, then the court must engage in the more forgiving, traditional weighing of the public and private factors set forth in *Gilbert* and its progeny. The difficulty is that there are two separate credit agreements in this case, each with its own forum selection clause. The 1994 Agreement contains language that is clearly exclusive,[10] while the 1996 Agreement clearly does not.[11] Not surprisingly, defendants view the permissive language of the 1996 Agreement as controlling, whereas plaintiff presents the exclusive wording of the 1994 Agreement as dispositive. Neither side adequately explains why their preferred interpretation of the agreements should prevail. However, the court need not resolve this discrepancy because, even under ordinary forum non conveniens analysis, defendants fail to establish that the balance of public and private interests tilt decisively toward the Chilean forum.

First, the private interest factors do not clearly favor defendants' choice of forum. These private factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. Consideration of these concerns necessarily involves "comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74. In this case, the court cannot say that there would be any net reduction in hardship if this litigation were pursued in a Chilean court. As suggested previously, moving the litigation overseas would simply shift to plaintiff the very costs that defendants seek to avoid.

In fact, those costs would, if anything, be raised. Defendants' protestations notwithstanding, this case is, at its core, about their obligation to make payments to a United States bank account, as required by English language agreements, all of which were negotiated in New York. Much of the relevant evidence and many of the key witnesses are thus likely to be located in this country. As a result, requiring plaintiff to transport its witnesses and documents overseas would almost certainly be more expensive than requiring defendants to do the same.

This calculus remains substantially the same even if one factors in defendants'

---

**10.** The 1994 Agreement provides, in relevant part: "[Inverraz] hereby absolutely and irrevocably consents and submits to the *exclusive* jurisdiction of the courts of the State of New York and of any federal court located in said jurisdiction...." (emphasis added).

**11.** The 1996 Agreement provides, in relevant part: "[Inverraz] hereby absolutely and irrevocably consents and submits to the *non-exclusive* jurisdiction of the courts of the State of New York and of any federal court located in said jurisdiction...." (emphasis added).

alleged counterclaims for tortious interference and breach of contract.[12] Defendants' insist that critical proof of these claims lies in Chile. However, their own affidavits indicate that "itemized details and evidence as to the Plaintiff's Unlawful Interference Conduct are contained in the files of [Gibson Dunn]," here in the United States. Errazuriz Aff. at ¶ 70. What is more, defendants allege, as part of their counterclaims, that plaintiff disrupted their business relationship with Tamaya Chemical. As plaintiff points out, however, "Tamaya is a U.S.-based company that was the U.S. distributor for defendants' iodine products." (Pl.'s Opp'n Mem. at 15 n. 7 (citing Reilly Dep. at Ex. 8).) Finally, defendants' assert that they would be constitutionally precluded from litigating these counterclaims in a United States federal court. But the case they cite in support of this contention, *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491–92, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), says nothing of the sort. Rather, *Verlinden* stands simply for the proposition that the diversity clause of Article III of the United States Constitution is not broad enough to permit federal court jurisdiction over claims by foreign plaintiffs against foreign sovereign defendants. Since all the parties in this action are private entities, the court clearly has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).[13]

Additionally, defendants have failed to demonstrate that the public interest factors favor litigation in the Chilean forum. The public interest most relevant to this dispute is the "appropriateness ... in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." Both the 1994 and 1996 Credit Agreements clearly state that they are to be "interpreted under and enforced in accordance with and governed by the laws of the state of New York without regard to principles of conflict of laws." And it is well settled that, "[a]s a general rule, choice of law provisions ... are valid and enforceable in New York." *Marine Midland Bank, N.A. v. United Mo. Bank, N.A.*, 223 A.D.2d 119, 122–23, 643 N.Y.S.2d 528 (1st Dep't 1996) (citations omitted). Defendants have not given this court any reason to believe that their assent was procured by means of fraud or duress. The balance of public interest factors would thus seem to favor retention of this suit since a federal court in New York is in a much better position than its Chilean counterpart to construe applicable New York law in resolving plaintiff's claims.[14]

In sum, after weighing the relevant public and private interest factors, the court finds that defendants have failed to demonstrate that they have a meritorious defense pursuant to the doctrine of forum non conveniens. Even if plaintiff were not entitled to deference regarding its choice of forum, the court simply does not believe

---

**12.** Defendants' counterclaims are discussed in greater detail in Part B.2, *infra*. Defendants make much of the fact that their counterclaims total some $200 million, exceeding plaintiff's damages by roughly $60 million. However, it is not at all clear how they reach that sum. As such these are just numbers, entitled to no legal weight.

**13.** 28 U.S.C. § 1332(a)(2) states: "The district court shall have original jurisdiction of civil actions where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of a State and citizens or subjects of a foreign state...."

**14.** Defendants' purported counterclaims do not alter this conclusion. Most of these involve interpretation of the credit agreements, in one fashion or another. As a result, they too are governed by the New York choice of law provisions.

that the balance of conveniences in this case favors the Chilean forum.

## 2. Defendants' Counterclaims

As suggested previously, defendants advance a host of counterclaims, rooted in contract and tort law, arising out of plaintiff's allegedly bad faith and tortious conduct. First, defendants allege that plaintiff has impermissibly interfered with defendants' property, prior to a court judgment on the merits of their dispute, in violation of United States Supreme Court and New York State Court of Appeals precedent. (Defs.' Mem. at 107–11.) Second, defendants claim that plaintiff has engaged in activity that constitutes a breach of its implied obligation of good-faith and fair dealing under the Credit and Guaranty Agreements. *Id.* at 112. Third, defendants allege that plaintiff has engaged in knowing, intentional, and/or tortious interference with defendants' contractual relations, business operations, and prospective economic advantage. *Id.* at 113–16. Fourth, defendants accuse plaintiff of having made fraudulent and/or negligent misrepresentations regarding their rights under the Credit and Guaranty Agreements. *Id.* at 116–17. Fifth, defendants claim that plaintiff has breached its fiduciary duty owed under the Credit and Guaranty Agreements. *Id.* at 118–120. Sixth, defendants argue that plaintiff's suit against them is defective because it violates the conditions for bringing suit set forth in the Credit and Guaranty Agreements. *Id.* at 75. Seventh, defendants contend that the default judgment filed by plaintiff is defective because it contains a declaratory ruling that restricts the assets of a company that is not even a party to the lawsuit. (Defs.'

Reply Mem. at 5–9.) Eighth and finally, defendants contend that the default judgment is defective because it awards damages against four defendants who are not guarantors under either the 1996 or 1994 Credit Agreements, and two other defendants who are not Guarantors under the 1996 Agreement. *Id.* at 10.

▮ Plaintiff urges the court to reject all of defendants' counterclaims as invalid as a matter of law. Plaintiff offers two principal justifications for this result. The first is that defendants' counterclaims should be dismissed because they do not arise from the same transaction as that at the core of this case. (Pl.'s Opp'n Mem. at 18–21.) However, many of defendants' counterclaims seem to involve breaches of the very same Credit Agreements that plaintiff sues under. As such, they almost certainly do arise out of the same transaction, broadly defined. Plaintiff's other main argument is that defendants waived their right to interpose such counterclaims as a condition of both Credit Agreements. *Id.* at 21–22. However, New York law does not permit a party to invoke such waiver provisions to shield its malicious or fraudulent conduct. *See, e.g., Mfrs. Hanover Trust Co. v. Palmer Corp.,* 798 F.Supp. 161, 167 (S.D.N.Y.1992) (Haight, J.) ("[W]aivers [of defense] will not be enforced so as to bar a viable setoff or counterclaim sounding in fraud.") (quotations omitted).

Only the first of defendants counterclaims is so clearly invalid that the court is prepared to dismiss it out of hand. The cases cited by defendants, all of which deal simply with the limits on a *court's* equitable power to preliminarily enjoin a debtor's asset transfers, cannot serve as the basis for a viable counterclaim.[15] Ac-

---

15. They do, however, tend to undermine the validity of plaintiff's application for a preliminary injunction or supersedeas bond pending resolution of this dispute. In any event, since the default judgment remains in effect, plaintiff's concerns are less pressing, and its request is denied. Should said judgment be

cordingly, defendants' first counterclaim is dismissed. However, the factual record regarding defendants' seven remaining counterclaims is simply too incomplete for the court to conclude one way or the other whether they constitute meritorious defenses. These seven remaining counterclaims, like the question of the willfulness of defendants' default, are thus referred to the magistrate judge for further inquiry. After defendants have been given an opportunity to flesh out the factual foundation for each counterclaim, Magistrate Judge Maas will decide "whether the defendants possess a substantial meritorious defense, or whether the claims made in defendants' papers on these motions are just 'spurious.'" *Ferraro*, 131 F.R.D. at 420. Defendants insist that, given a meaningful opportunity, they can present compelling evidence of the viability of the seven remaining counterclaims.[16] Until they do, however, the default judgment stays in effect.

### C. Prejudice

A similar problem surrounds the third and final inquiry this court must make in reviewing a F.R. Civ. P. 60(c) motion to vacate on grounds of excusable neglect: whether plaintiff would suffer prejudice if the default judgment were vacated. Plaintiff argues that the prejudice here is "palpable" because "for more than one year defendants have been orchestrating a campaign to spirit assets beyond the reach of plaintiff and creditors." (Pl.'s Opp'n Mem. at 22, 23.) These are troubling allegations, indeed. The difficulty is that plaintiff fails to support them with anything more than its own attorney's affirmation, which is based mostly on secondhand information

and belief. The court does not mean to suggest that plaintiff bears the ultimate burden of demonstrating prejudice to the satisfaction of the court. Indeed, if defendants fail to offer some compelling proof of their own on this subject, the determination should prove a fairly easy one. However, as with defendants' counterclaims, there simply is not enough information on the record for this court to make a reasoned determination on this issue. And given the enormous sums of money at stake in this case, along with the Second Circuit's avowed preference for settling disputes on the merits, the court believes it wise to refer this factual dispute to Magistrate Judge Maas as well.

### CONCLUSION

To summarize, defendants have not, as yet, presented sufficient evidence on the issues of willfulness, meritorious defense, and prejudice to justify vacating the default judgment. What they have done is raise a number of questions that warrant further briefing and factual inquiry. Accordingly, the court refers them to Magistrate Judge Frank Maas for report and recommendation.

**IT IS SO ORDERED.**

---

vacated, of course, the court will reconsider its ruling.

**16.** To be perfectly clear, defendants' are ordered to confine their evidentiary submissions concerning the merits of their defenses to the seven remaining counterclaims specified above. The purpose of this hearing is not to give defendants an opportunity to comb the case law for still more legal defenses to interpose in this case—the time for that endeavor has passed.