**STATE STREET BANK AND TRUST COMPANY, Plaintiff,**

**v.**

**INVERSIONES ERRAZURIZ LIMITA-DA (f/k/a Inversiones Errazuriz S.A.), et al., Defendants.**

**No. 01 Civ. 3201(RLC).**

United States District Court, S.D. New York.

Nov. 5, 2002.

Debevoise & Plimpton, New York City (Joseph P. Moodhe, of counsel), for Plaintiff.

Law Offices of Michael B. Wolk, P.C., New York City (Michael B. Wolk, of counsel), for Defendants.

## OPINION

ROBERT L. CARTER, District Judge.

This litigation concerns the propriety of a default judgment issued against defendants on November 30, 2001, for $140 million. Defendants filed a motion to vacate the default on December 19, 2001, asserting that the default was not willful, along with some nine allegedly meritorious counterclaim defenses and a contention that the vacatur of the default judgment would not prejudice the plaintiff. On February 4, 2002, the court filed an opinion, with which

familiarity is assumed, 230 F.Supp.2d 313, dismissing two of the claimed counterclaim defenses and referring the issues of willfulness of the default, the meritoriousness of the seven remaining counterclaim defenses and whether vacatur would cause prejudice to plaintiff to Magistrate Judge Frank Maas for further inquiry. On August 15, 2002, the magistrate judge filed his Report and Recommendation ("R & R") in which he found (at 12–20) that defendants had not willfully defaulted, that their counterclaim defenses lacked merit (*id.* at 20–39), and that to vacate the default judgment would prejudice plaintiff (*id.* at 39–43).

Defendants filed timely objections to the R & R on September 13, 2002, having been granted by stipulation and order an enlargement of time to file objections beyond the normal ten day deadline. Defendants

> pursuant to the legal reasons set forth below, (a) object to these portions of the Magistrate [sic] Report, (b) they maintain that the evidence adduced at the Hearing shows the existence of a meritorious defense or counterclaim in this case, (c) they maintain that the evidence adduced at the Hearing shows that there would not be an impermissible level of prejudice to the Plaintiff if the default judgment were vacated and (d) they respectfully request that Judge Carter determine, as a matter of law, that they have satisfied their burden, under FRCP 60(b), of showing the existence of a meritorious defense or counterclaim, and that vacatur of the default judgment would not result in an impermissible level of prejudice to the Plaintiff herein.

(Defs.' Obj. at 3–4.) Defendants also objected to pages 20–29 of the R & R that they "have not shown the existence of a meritorious defense" and to pages 39–43 of the R & R that they have not shown that plaintiff would not be prejudiced if the motion to vacate the default judgment was granted. (*Id.*)

Plaintiff in its response to defendants' objections contended that except for their objection to the finding on the defense of the implied obligation of good faith and fair dealing, the objections to the remaining lack of meritorious defense and prejudice to plaintiff findings are not sufficiently specific and should be disregarded by the court. (Pl.'s Reply Mem. at 23–24.) In reply defendants repeat in summary their prior arguments. Neither side contests the R & R finding on the question of willfulness.

The court has reviewed: (1) the transcripts of April 3, 2002, in which the dates and contour of the forthcoming hearing before the magistrate judge was agreed to; (2) the May 23 and May 24, 2002 transcripts of the hearing itself; (3) all the exhibits introduced at the hearing, the R & R, the defendants' objections and letter reply to plaintiff's response, and plaintiff's response to defendants' objections.

The depositions of Messers. Foncillas or Trujillo, two lawyers in the Gibson, Dunn & Crutcher firm ("Gibson Dunn") were not read, but their testimony has no relevance to the issues under present consideration since at best it would concern the question of willfulness to which neither side objects or the reason Gibson Dunn refused to represent defendants in this proceeding, matters irrelevant to the issues presently under court consideration. Accordingly, review of the materials set forth above sufficed as to the merits of the counterclaim defenses and the issue of prejudice to meet the de novo review requirements of Rule 72(b), F.R. Civ. P. *See United States v. Raddatz,* 447 U.S. 667, 674, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

Initial Proceedings in the District Court

On April 16, 2001, plaintiff filed suit against defendants in this court seeking to

recover in excess of 100 million dollars owed pursuant to two credit agreements executed in 1994 and 1996 respectively. (Compl.¶ 1.) Defendants filed no answer, but for several months the parties engaged in settlement discussions. In late June, 2001, the parties entered a stipulation extending the time to answer, in which defendants acknowledged service of process and the personal jurisdiction of the court. The stipulated extended time to answer passed, but the effort to reach an agreeable solution continued. On September 28, 2001, plaintiff, however, filed a motion for default judgment. The deadline for defendants to file responsive pleading to the motion passed with no word from defendants. On November 30, 2001, the court granted plaintiff's motion and entered default judgment for roughly 140 million dollars against defendants.

Present counsel for defendants, early in December, 2001, advised the court that he now represented defendants, and against the court's advice that the proper response was a motion to vacate the default judgment filed an order to show cause. The court refused to accept that pleading and finally on December 19, 2001, defendants filed a motion to vacate the default judgment.

Defendants contended that the case is within the purview of F.R. Civ. P. 60(b), which provides that a default judgment may be set aside for reason of "mistake, inadvertence, surprise, or excusable neglect." In assessing the existence of excusable neglect, the court must determine: "(1) whether the default was willful; (2) whether the defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non defaulting party if relief is granted." *Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir.1996) (*quoting Davis v. Musler*, 713 F.2d 907, 915 (2d Cir.1983)).

Defendants contended that their default was not willful but was based on a good faith belief that Gibson Dunn, the firm that had handled their legal affairs in the United States for some 25 years would represent them in this litigation. They asserted that the plaintiff's case should be dismissed on the grounds of forum non conveniens, and in addition alleged the following eight counterclaim defenses as part of their meritorious defense showing: (1) that plaintiff has impermissibly interfered with defendants' property prior to court judgment on the merits of their dispute (Defs.' Mem. at 107–11); (2) that plaintiff has engaged in activity constituting a breach of its implied duty of good faith and fair dealing under the credit and guaranty agreements (*id.* at 112); (3) that plaintiff has engaged in knowing, intentional and/or tortious interference with defendants' contractual relations, business operations and prospective economic advantage (*id.* at 113–16); (4) that plaintiff made fraudulent and/or negligent misrepresentations regarding their rights under the credit and guaranty agreements (*id.* at 116–17); (5) that plaintiff has breached its fiduciary duty required under the credit and guaranty agreements (*id.* at 118–20); (6) that plaintiff's case is defective in that it violates the conditions for bringing suit set forth in the credit and guaranty agreements (*id.* at 75); (7) that the default judgment is defective because it contains a declaratory ruling that restricts the assets of a non party to this lawsuit (Defs.' Reply Mem. at 5–9); and (8) that the default judgment is also defective in awarding damages against four defendants who are not guarantors under either the 1994 or 1996 credit agreements and against two defendants who are not guarantors under the 1996 credit agreement (*id.* at 10).

In its February 4, 2002 opinion at *4–8, the court dismissed defendants' forum non

conveniens claim and the first counter-claim defense, i.e., that plaintiff has imper-missibly interfered with defendants' prop-erty prior to a court judgment. *See State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 230 F.Supp.2d 313 (S.D.N.Y.2002) (Carter, J.). The issue of willfulness, the seven remaining counter-claim defenses, and the question of the prejudice to plaintiff if the motion to va-cate the default judgment was granted were referred to Magistrate Judge Frank Maas for further inquiry. Magistrate Judge Maas was to decide "whether the defendants possess a substantial meritori-ous defense, or whether the claims made in defendants' papers … are just 'spuri-ous.'" *Id.* at 323 (citing *Ferraro v. Kuz-netz*, 131 F.R.D. 414, 420 (S.D.N.Y.1990) (Patterson, J.)). Referral of these issues to Magistrate Judge Maas was to afford defendants the opportunity to present the compelling evidence they claimed to pos-sess showing that the default was not will-ful, the lack of prejudice to plaintiff if defendants prevail, and the viability of their seven counterclaim defenses estab-lishing their meritorious defense, thus making it appropriate for the court to va-cate the default judgment.

Defendants were ordered to confine their evidentiary submissions concerning the merits of their defenses to the seven counterclaim defenses specified in the court's opinion. "The purpose of [the hearing before Magistrate Judge Maas] is not to give defendants an opportunity to comb the case law for still more legal defenses to interpose in this case—the time for that endeavor has passed." *Id.* at 324 n. 16. In summary the court stated "defendants have not, as yet, presented sufficient evidence on the issues of willful-ness, meritorious defense, and prejudice to justify vacating the default judgment. What they have done is raise a number of questions that warrant further briefing

and factual inquiry. Accordingly, the court refers them to Magistrate Judge Frank Maas for report and recommenda-tion." *Id.* at 324.

<center>Proceedings Before The<br>Magistrate Judge</center>

Magistrate Judge Maas held a confer-ence on April 3, 2002, with the parties and Mitchell A. Karlan and Richard J. Davis, attorneys from the Gibson Dunn firm. At the conference, the deposition of each of the attorneys of Gibson Dunn whom the parties wanted to depose was agreed to, and agreement was reached as well for the production of all documents from the firm deemed relevant by the parties. The parties agreed to submit supplemental re-sponses to various interrogatories to satis-fy the other side that the information giv-en was full and complete.

A forthcoming evidentiary hearing was set at which point Magistrate Judge Maas inquired: "the sum of what I am going to hear is what will be set forth in your supplemental responses to the interrogato-ry and anything else you may garner from the three depositions that are to be taken and the Reilly deposition that was already taken, correct?"

Mr. M. Wolk: "I mean, that sounds fair to me and that's what I'll try to do."

The court: "So Mr. Moodhe and I can both be comfortable that when and if there is a hearing, none of your clients will be coming in and testifying about something that either hasn't been testi-fied to previously by Gibson Dunn law-yers or hasn't been set forth in your interrogatory response as to the rele-vant issue of what promises or commit-ments were made."

Mr. M. Wolk: "That is fine."

The court: "O.K. I assume that works for you, Mr. Moodhe."

Mr. Moodhe: "Yes, your Honor, it does."

(Tr. at 36–37.) [1]

A two day evidentiary hearing was held on May 23–24, 2002. At the hearing was Senator Francisco Javier Errazuriz—Talavera, head of the family having a controlling interest in Inversiones Errazuriz Limitada ("Inverraz") as well as in all the other defendants, Conor D. Reilly, a partner in Gibson Dunn, Jorge Sims, chairman of the Board of Inverraz, Francisco Javier Errazuriz–Ovalle, the Senator's son and general manager of Inverraz and Blake T. Franklin, a partner in Gibson Dunn who had handled or overseen the handling of various legal activities for the Senator and his many business operations for roughly 25 years.

Thereafter the parties filed their briefs. After review of the testimony adduced at the hearing and the parties' extensive briefing, Magistrate Judge Maas on August 15, 2002, filed his R & R holding that defendants' motion to vacate the default should be denied.

He made detailed and specific findings of fact and conclusions of law as to each issue submitted to him for inquiry. He concluded, after a thorough review of the facts and circumstances surrounding defendants' 25 year relationship with Gibson Dunn, that defendants' delay in responding to the instant action could not "be characterized as 'wilful,'" and that therefore defendants "had met their burden with respect to this first element of the showing necessary to vacate the default judgment." (R & R at 20.)

Magistrate Judge Maas concluded that each of defendants' seven counterclaim defenses submitted to him for further inquiry (breach of obligation of good faith and fair dealing, tortious interference, fraudulent and/or negligent misrepresentations, breach of fiduciary duty under the credit and guaranty agreements, institution of suit violates conditions in the agreements for bringing suit, default judgment defective in restricting assets of a company not involved in the case, and default judgment defective in awarding damages against defendants not guarantors and therefore that defendants had failed to establish a meritorious defense) (R & R at 20–39) lacked merit. Although that alone required that the motion to vacate the default judgment be denied, *see, e.g., Sony Corp. v. Elm State Electronics, Inc.*, 800 F.2d 317 (2d. Cir.1986); *National Union Fire Ins. Co. v. Allard*, No. 87 Civ. 5368, 1989 WL 71168, at *1 (S.D.N.Y.1989) (Stanton, J.), because the issue of prejudice had also been referred to him, he undertook to decide that question as well.

The magistrate judge at defendants' request had, prior to the evidentiary hearing, required plaintiff to detail in an interrogatory answer how it would be prejudiced if the default judgment were to be vacated. Plaintiff identified "a lengthy series of allegedly improper transactions involving Cosayach and its subsidiaries" (R & R at 40) to show that it would be prejudiced by vacatur of the default judgment. (*See* Defs.' Exh. O.) At the evidentiary hearing Sims had agreed that each of the transactions had occurred after Inverraz had defaulted on its loan payments. (Tr. at 232.) Sims' testimony that the transactions did not violate the credit agreement notwithstanding (*id.* at 228), Magistrate Judge Maas concluded that each of the postdefault transactions violated the terms of the credit agreements (R & R at 40) since he found that Cosayach was a restricted subsidiary and could not be sold while Inverraz was in default, but that defen-

---

**1.** Tr. refers to transcript of the April 3, 2002 hearing.

dants "continue to ignore the plain language of their agreements, as well as the negative covenants designed to protect State Street's investment, there obviously is a substantial risk that such impermissible transactions will continue in the future if the default judgment is vacated". (R & R at 43.) He concluded that defendants had not met their burden of showing a lack of prejudice. (*Id.*)

### Defendants' Objections and Plaintiff's Response

Defendants maintain that they have established "at least three meritorious defenses or counterclaims which, if established at trial, would be a complete defense and/or offset to plaintiff's claims: (a) conduct by the Plaintiff which ... would constitute a breach of Plaintiff's implied obligation of good faith and fair dealing in the performance and/or enforcement of the subject loan and guaranty contracts entered into by the parties [this is a complete defense to Plaintiff's claims], (b) conduct by Plaintiff which ... would constitute a tortious interference with the Chilean Defendants' contractual relations, business expectancies and prospective economic advantage in Chile [this is a complete, related counterclaim to the Plaintiff's claims] and (c) conduct by the Plaintiff which ... would constitute a failure to fulfill a required condition precedent to the institution of this lawsuit in this Court [this is a complete defense to Plaintiff's claims]." (Defs.' Obj. at 4.)

The first objection as more fully articulated appears to be a counterclaim defense not heretofore argued before the magistrate judge or the district court to the effect that plaintiff had violated its implied covenant of good faith and fair dealing in seeking to extract from defendants collateral and other economic benefits as the price for its agreeing to approve a deal with SQM pursuant to which defendants would receive $140 million, $87 million of which would go to plaintiff and reduce defendants' indebtedness to plaintiff. (*Id.* at 11–40.)

The second objection is a repetition of their failed argument before the magistrate judge that they had a meritorious counterclaim defense to the effect that plaintiff had been guilty of tortious interference with Inverraz's negotiations for the sale of the nitrate and iodine assets of Cosayach to SQM. The third objection was also a contention rejected by the magistrate judge to the effect that the suit is defective in that plaintiff failed to fulfill a required condition precedent prior to instituting this litigation.

For the substance of these two objections, the court is referred "to their prior submissions" before the district court and the magistrate judge. (*Id.*) In these prior submissions defendants contend that plaintiff engaged in tortious interference with defendants' attempt to make a deal with SQM for the sale of the assets of Cosayach for $140 million, $87 million of which plaintiff would receive in partial payment of defendants' debt to plaintiff, and that in not allowing that deal to be consummated plaintiff violated its obligation of good faith and fair dealing. The failure to fulfill a prerequisite for institution of the lawsuit is based on a condition in the participation agreement between State Street and the participants for instituting a lawsuit against them, in which defendants were not parties.

In addition, defendants object to pages 20–29 of the R & R holding that they have not established a meritorious counterclaim defense and to pages 39–43 of the R & R that they have not shown a lack of prejudice warranting vacatur of the default judgment. (*Id.* at 3–4.)

Plaintiff filed a response to defendants' objections to the R & R on October 4, 2002. Plaintiff challenged every argument of defendants, contending that none of the seven counterclaim defenses had merit and that plaintiff would be prejudiced if the default judgment was vacated. (Pl.'s Reply Mem. at 7–14.) Plaintiff relies on the evidentiary hearing before the magistrate judge and New York law, citing *Astor Holdings, Inc. v. Roski*, No. 01 Civ.1905, 2002 WL 72936, at *19 (S.D.N.Y. Jan. 17 2002) (Lynch, J.) to support its contention that defendants' tortious interference contention cannot constitute a meritorious defense and should be rejected. (Pl.'s Reply Mem. at 14–17.)

Plaintiff also asserts that defendants, in now arguing that plaintiff violated its contractual duty of good faith and fair dealings in demanding collateral before it would give consent to defendants' concluding negotiations with a third party for the sale of the assets of Cosayach, have stated a new defense not raised previously before the district court or the magistrate judge. They contend that defendants cannot raise anything other than what the district court referred to the magistrate judge, and that in any event the contention lacks merit and should be dismissed. (*Id.* at 17–21.)

In its final argument, plaintiff contends that defendants' objections are not sufficiently specific to warrant de novo review by the district court, and that absent a finding of clear error the R & R should be adopted as the opinion and judgment of the court. (*Id.* at 21–24.)

In a reply filed on October 7, 2002, defendants for the most part reiterate in summary form their original arguments. (*See* Defs.' Lt. Reply.)

## DETERMINATION

■ In arguing for the first time that plaintiff has violated its implied covenant of good faith and fair dealing in not consenting to defendants consummating a $140 million deal without first receiving new collateral, defendants have rephrased their good faith and fair dealing counterclaim defense into a seemingly hybrid tortious interference violation of the implied covenant of good faith and fair dealing counterclaim defense. This defense could be dismissed summarily since defendants did not raise this as one of their meritorious counterclaim defenses either before the district court or the magistrate judge. As indicated ante, they were specifically limited to fuller exploration of only those counterclaim defenses raised in the district court which had been referred to the magistrate judge for further inquiry pursuant to Rule 55(c), F.R. Civ. P.

Defendants' tortious interference objection does not seem to comply sufficiently with the specifications of Rule 72(b) since filing prior submissions before the district court and the magistrate cannot qualify as the required specific objections to the R & R. *Camardo v. General Motors Hourly–Rate Employees Pension Plan*, 806 F.Supp. 380, 381–82 (W.D.N.Y.1992) (stating that it is "improper ... to attempt to relitigate the entire content of the hearing before the Magistrate Judge by submitting papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge"); *Barratt v. Joie*, No. 96 Civ. 0324, 2002 WL 335014, at *1 (S.D.N.Y. March 4, 2002) (Swain, J.) ("[w] hen a party ... simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error") (citing *Camardo*, 806 F.Supp. at 382.).

■ Defendants' objection to pages 29–39 of the R & R to the effect that they have not made out a meritorious defense

and/or counterclaim and to pages 39–43 of the R & R to the effect that they have not shown that plaintiff would be subject to an impermissible level of prejudice (Defs.' Obj. at 3–4) constitute generalized objections which do not require de novo review. *Greene v. WCI Holdings Corp.*, 956 F.Supp. 509, 517 (S.D.N.Y.1997) (Edelstein, J.); *see also Vargas v. Keane*, No. 93 Civ. 7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.).

However, the court has reviewed this matter de novo because dispositions on procedural grounds are generally not favored, and in view of the sum of money at stake, a study of the record and the law by both the magistrate judge and the court should provide double assurance that the final disposition is a fair one.

■ The tortious interference defense, for example, as originally stated, was that plaintiff had caused Inverraz to fail in negotiating with SQM for the sale of the assets of Cosayach for $140 million by giving SQM notice of this litigation and requiring it not to come to an agreement in the negotiations without their consent.

The evidence shows, however, that SQM was advised of litigation against Inverraz, filed on March 26, 2001, in New York state court by Bank of New York's ("Bony") Chilean lawyer shortly thereafter. The state court litigation is totally unrelated to this case. (Tr. at 50, 221; Pl. Exh. 1.) After learning on March 26, 2001, of the Bony litigation, at the next meeting of SQM and Inverraz SQM announced that it would not conclude the Cosayach negotiations without the "written permission of those who had started the lawsuit." (*Id.* at 189–90, 223.) This case was not instituted until April 16, 2001, and a copy of the complaint was subsequently forwarded to SQM.

In ¶¶ 42–44 of the complaint, plaintiff alleges that the proposed sale of the assets of Cosayach to SQM would violate both the 1994 and 1996 credit agreements because under the terms of those agreements, while in default in payments of the loan, Inverraz could not sell its own assets or those of certain of its subsidiaries termed "restricted subsidiaries." By letters of April 24 and 26, 2001, Inverraz promised plaintiff's counsel that it would not sell any of Cosayach's assets to SQM without plaintiff's prior consent. (Tr. at 56; Pl. Exh. 2.) Negotiations among defendants SQM and the lenders continued, but on October 5, 2001, SQM advised Inverraz that it would not close the deal. (Tr. at 36, 67; Pl. Exh. 6.) In its letter terminating further negotiations SQM refers to both "internal and external" difficulties as cause for its action. (Pl.Exh. 6.)

■ Under New York law, which is controlling, a viable tortious interference with a prospective contract claim must establish a business relation with a third party, defendants' interference with that relationship, which interference was for the sole purpose of harm to plaintiff or that improper, dishonest, or unfair means were used, and that injury to the business relationship occurred. *See Astor Holdings, Inc.*, 2002 WL 72936, at * 19 (citing *Nadel v. Play–by–Play Toys & Novelties Inc.*, 208 F.3d 368, 382 (2d Cir.2000) (citations omitted)).

At the time of the SQM negotiations Cosayach was a Restricted Subsidiary, defined to include any Chilean company of which Inverraz directly or indirectly owned 75 percent of the voting stock or held a 75 percent financial interest. (Defs.' Exh. G and K, § 10B). Jorge Sims, chair of the Inverraz Board, conceded that Cosayach was a restricted subsidiary (Tr. at 202, 234), and Inverraz was unquestionably in default at the time of the attempted sale. (*Id.* at 232.) Plaintiff had every

right to insist that Cosayach assets not be sold without its permission, and its insistence that defendants adhere to their bargain cannot support a tortious interference claim, since it was an understandable attempt by plaintiff to protect its considerable financial investment.

Defendants' allegation that SQM chose not to proceed without the consent of the American lenders because, after receipt of threats from Bony and plaintiff, it did not want to jeopardize its relationships with American financial institutions (*id.* at 57), and the Senator's testimony that the deal fell through because Bony and plaintiff unreasonably withheld consent (*id.* at 66) is belied by the record. Moreover, even if it were true, plaintiff could not be guilty of tortious interference with the contract negotiations because under the circumstances such action would have been motivated by protection of plaintiff, not harm to Inverraz.

■ Defendants' new hybrid "implied covenant of good faith and fair dealing and tortious interference" claim is without merit as well. This claim, a variation of the one just discussed, seems to be that plaintiff acted with a bad faith purpose because it sought as a price for giving consent to the sale of Cosayach's assets to SQM for $140 million, $87 million of which would be applied to the $140 million owed plaintiff to extract from Inverraz additional collateral and other economic benefits to which it was not entitled, thereby violating its implied covenant of good faith and fair dealing. By withholding its consent under such circumstances, plaintiff is alleged to have "frustrated the Chilean defendants' reasonable contractual expectations that: (a) their assets could be sold to pay their debt to the plaintiff and (b) the plaintiff would facilitate, not prevent, the sale of assets for this purpose." (Defs.' Obj. at 11, emphasis and caps re-

moved). Thus, the argument concludes plaintiff's bad faith refusal deprived defendants of $140 million to pay plaintiff and other senior creditors, causing damages which constitute a complete defense to plaintiff's claims. (*Id.* at 12.) Defendants cite a long series of New York and federal case law, Restatement of Contracts, other treatises and a Harvard Law Review article (*see id.* at 19–40), discussing the implied covenant of good faith and fair dealing. Unfortunately, the cited legal authority is totally inapposite.

■ The implied covenant of good faith and fair dealing applies to the performance and execution of an existing contract. Neither party may act to deny the other the fruits of the contract. *Bank of New York v. Sasson,* 786 F.Supp. 349, 353 (S.D.N.Y.1992) (Mukasey, J.). This implied covenant does not require a party to act against his own self interest even though the other party's interest may be incidentally adversely affected by the party's action. *M/A—COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (per curiam); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.,* 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972). The plaintiff had the right to withhold its consent to the sale of Cosayach's assets because under the terms of the agreements it was a restricted subsidiary which Inverraz could not sell while in default on payment of the loan. As we have seen, Cosayach was a restricted subsidiary and Inverraz was in default.

■ There was no explicit language in the loan agreements or guaranty that the parties may not unreasonably withhold its consent, leaving it free to withhold consent for any reason and "no implied obligation to act in good faith exists to limit the choice." *Teachers Ins. and Annuity Ass'n of Am. v. Wometco Enters., Inc.,* 833 F.Supp. 344, 349 (S.D.N.Y.1993) (Sprizzo,

J.) (holding that a party's insistence that, before it will consent to refinancing proposal, the other party must agree to new terms was not a breach of good faith). Nor does the covenant apply to settlement negotiations, extensions, or modifications of the existing contract. *See Sasson,* 786 F.Supp. at 354; *Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 535 (S.D.N.Y.1996) (Koeltl, J.). Thus, this counterclaim defense cannot survive.

Defendants seem confused as to the status of the case before the magistrate judge. They place great reliance on *Davis v. Musler,* 713 F.2d 907, 916 (2d Cir.1983), *Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d 372, 374 (D.C.Cir.1980) and cognate cases in which further fact finding was needed before the motion for default judgment could be upheld. In *Keegel,* the court indeed stated that defendants' allegations as to a meritorious defense were sufficient if they contained "even a hint of a suggestion" which if proved at trial would be a complete defense. Unfortunately for defendants this case has moved beyond the status of *Davis, Keegel* and the others relied on.

In none of those cases had there been any fact finding. Defendants had not been permitted to present any evidentiary proof in support of their contentions that they had a meritorious defense. Indeed, in *Davis,* the Second Circuit faulted the district judge for not using Rule 55(c) to allow further exploration of the meritorious defense claim. Defendants' argument would have been on point if the motion to vacate the default judgment had been denied while the matter was initially before the district court without defendants being given the opportunity to provide some evidence that they had a meritorious defense. The referral to Magistrate Judge Maas was for the purpose of allowing defendants to provide evidence that the default had not been willful, that they had a meritorious defense, and a lack of prejudice to plaintiff if the default judgment was not vacated.

*Keegel's* "hint of a suggestion of a meritorious defense" is no longer applicable. Defendants no longer write on a blank page. The page is filled with testimony of the principal defendants concerning their activities relevant to the loan agreements and guaranties undertaken. Defendants cannot now articulate a meritorious defense or even as a "hint of a suggestion" of such when the evidentiary record makes clear what is articulated or hinted has no merit.

Although defendants must supply more than a hint of a suggestion that a meritorious defense exists, even at this stage of the proceedings they are not required to make a showing of such a defense with the finality necessary in a trial on the merits. *Davis v. Musler,* 713 F.2d at 916 ("a defendant seeking to vacate a default judgment need not conclusively establish the validity of the defense(s) asserted") (internal citations omitted). When, as here, defendants have been given the opportunity to show that a viable defense exists, they are required to provide some credible indication that if the default judgment is vacated, defendants will be able at trial to establish with finality a meritorious defense which has a reasonable chance of carrying the day.

This the defendants have been unable to do. They keep repeating or rephrasing the claims asserted at the outset before the district court and reiterated before the magistrate judge. The assertions are now empty cant either without support in the record or at war with the evidence thus far adduced. Since defendants have the burden of proof, their failure, when given the opportunity, to establish even the rudimentary elements of a meritorious defense is fatal.

Defendants claim they have not had the opportunity to secure evidence from plaintiffs. Yet, when on April 3, 2002, preparation for the evidentiary hearing was being discussed, defendants requested only some supplemental responses from plaintiff to their interrogatories which they stated would suffice. At the April 3 conference it was clear that the magistrate judge would have ordered plaintiff to provide any evidence reasonably sought. A claim now that they did not have the opportunity to secure needed evidence to flesh out a meritorious defense will not suffice. Moreover, the court's instructions in referring the case to Magistrate Judge Maas are clear: "the factual record regarding defendants' seven remaining counterclaims is simply too incomplete for the court to conclude one way or the other whether they constitute meritorious defenses....After defendants have been given an opportunity to flesh out the factual foundation for each counterclaim, Magistrate Judge Maas will decide" the nature of the defense. *State Street Bank and Trust Co.*, at 323. There could be no misunderstanding from that language that the purpose of the reference to the magistrate judge was to provide defendants with a forum before which they could show a sufficient evidentiary basis for setting this matter down for trial on the merits. It now seems evident that defendants have failed to present proof even minimally sufficient to show the existence of a meritorious defense because they have no meritorious defense. The Senator, his son, and Sims insist on misstating the terms of the agreements, and defendants' counsel repeats these misstatements in asserting that valid counterclaims and defenses exist, but the constant repetition of untruths cannot remove their falsity.

As to the other counterclaim defenses: (1) fraudulent and negligent misrepresentations, (2) good faith and fair dealing, (3) fiduciary duty owed under the Credit and Guaranty Agreements, (4) lack of standing by plaintiff to institute this litigation without fulfilling condition precedent, (5) improper restriction in default judgment, (6) improper guarantors as defendants and (7) the issue of prejudice to plaintiff, Magistrate Judge Maas has carefully and thoroughly measured all of these issues against the evidence adduced at the May 23–24 hearing before him, made findings of fact and conclusions of law and, having considered the applicable legal principles, concluded in each instance that defendants had not met their burden of stating a meritorious counterclaim defense and that plaintiff would be subject to an impermissible level of prejudice if the default judgment was vacated. The court finds his determinations to be correct both on the facts and the law.

For the reasons articulated in the R & R, the court incorporates the findings of fact and conclusions of law of the magistrate judge on those issues in the opinion and judgment of the court. The court also adopts the uncontested R & R of the magistrate judge that the default was not willful.

In sum, it is the opinion and judgment of the court that while the default was not willful, defendants have failed to establish a meritorious defense or that plaintiff would not be prejudiced if the default judgment is vacated.

Accordingly, defendants' motion to vacate the default judgment is denied.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION TO THE HONORABLE ROBERT L. CARTER

MAAS, United States Magistrate Judge.

I. *Introduction*

In this action, Plaintiff State Street Bank and Trust Company ("State Street")

seeks extensive damages as a consequence of the Defendants' default under Credit and Guaranty Agreements entered into in 1994 and 1996. On November 16, 2001, the Court (Carter, J.) granted State Street's motion for a default judgment, and on November 30, 2001, the Clerk of the Court entered a default judgment in the total amount of approximately $140 million.

On December 19, 2001, the Defendants filed a motion to vacate the default judgment which, in turn, led to the referral of certain issues to me for further inquiry. Following a two-day evidentiary hearing and a review of the parties' extensive briefing, I have concluded that the Defendants' motion should be denied and so recommend.

## II. *Factual Background*

### A. *The Underlying Transactions*

Although the agreements between State Street and the Defendants have been described as "long and complicated," (Tr. 136–37),[1] the basic transactions giving rise to this suit are straightforward. In brief, State Street supplied a Chilean entity known as Inversiones Errazuriz Limitada ("Inverraz") with two credit facilities: $50 million under a 1994 Credit Agreement and $65 million (in two tranches) under a 1996 Credit Agreement. (Compl. ¶¶ 16, 23). To induce State Street to enter into this financing, various Inverraz subsidiaries signed Guaranty Agreements in 1994 and 1996. More specifically, Commercial e Inmobiliaria Unimarc S.A., Pesquera Nacional S.A., Cidef S.A., Salmones Unimarc S.A., and Industria Forestal Nacional S.A.

signed the 1994 Guaranty Agreement ("1994 Guaranty"). (Defs.' Ex. I). Each of the 1994 Guarantors, as well as Compania de Salitre y Yodo Primera Región S.A. ("Cosayach") and Cidef Argentina S.A., signed the 1996 Guaranty Agreement ("1996 Guaranty").[2] (*Id.* Ex. F). None of the Defendants has made any payments to State Street with respect to Inverraz's indebtedness since 1999. (Tr. 44–45, 343).

To determine whether the Defendants' motion to vacate the default judgment has merit, one must understand certain details of both the loan documents and the interactions among the parties. Accordingly, I will turn to each of these issues in turn.

### B. *Loan Documentation*

#### 1. *Credit Agreements*

Both loans to Inverraz were memorialized by Credit Agreements which, insofar as relevant here, are substantially similar in form. Both Credit Agreements required Inverraz to repay the loans in semi-annual installments and provided that the failure to make timely payments constituted an Event of Default. (Defs.' Exs. G ¶ 7A, K ¶ 7A). State Street was entitled to accelerate Inverraz's indebtedness when an Event of Default occurred, in which case all of the interest and principal then outstanding, together with a "Make Whole Amount" would become immediately due and payable. (*Id.*).

The Credit Agreements both required as a condition of closing that certain Inverraz affiliates guarantee the loans through an "Affiliate Guaranty." (*Id.* ¶ 3I). The 1994

---

1. "Tr." refers to the transcript of the evidentiary hearing held in this case. "Pl.'s Ex." refers to the exhibits introduced at the hearing by State Street. "Defs.' Ex." refers to the exhibits introduced at the hearing by the Defendants.

2. The 1994 Guaranty and 1996 Guaranty are hereinafter referred to, collectively, as the "Guaranties." The Guarantors under both Guaranties are referred to, collectively, as the "Guarantors."

Guaranty and the 1996 Guaranty are those Affiliate Guaranties.

The 1994 Credit Agreement defines the Guarantors required to sign the Affiliate Guaranty as the five companies that signed the 1994 Guaranty. (Defs.' Ex. G ¶ 10B). The 1996 Credit Agreement contains a considerably more complicated provision which defines the term "Guarantors" to include

as of the first Closing Date, the Original Guarantors and, on any date thereafter, the Original Guarantors and any other Eligible Subsidiary which shall have become a Guarantor pursuant to paragraph 5L, provided that a Guarantor shall cease to be a Guarantor upon its release from its obligations under the Affiliate Guaranty in accordance with paragraph 20 thereof.

(Defs.' Ex. K ¶ 10B). Pursuant to Paragraph 5L of the 1996 Credit Agreement (and Paragraph 20 of the Guaranties), certain entities that had previously served as Guarantors of the 1996 loans might be released from further liability on any one of a number of predetermined Liability Calculation Dates. (Defs.' Exs. F ¶ 20, I ¶ 20, K ¶ 5L).

### 2. *Guaranties*

Under the terms of both Guaranties, the Guarantors each unconditionally agreed to pay a share of Inverraz's indebtedness which was referred to as its "Attributable Liability." (Defs.' Exs. F ¶ 3, I ¶ 3). Moreover, because the Guaranties guaranteed both payment and performance, not merely collectibility, State Street was not required to attempt to collect the outstanding loan balances from Inverraz before proceeding against the Guarantors in the event of a default. (*Id.*).

The Guaranties further provided that if, for any reason, a Guarantor fails to pay its Attributable Liability (the Guarantor in each case being referred to as the "Bankrupt Guarantor"), then the Attributable Liability of each non-Bankrupt Guarantor for the Guaranteed Obligations shall be increased by its pro rata [share of the Bankrupt Guarantor's Attributable Liability].

(*Id.* Defs. Exs. F ¶ 4, I ¶ 4). Thus, to the extent that any Guarantor proved unwilling or unable to honor its Guaranty, the liability of the remaining Guarantors under that Guaranty would be proportionally increased.

One key difference between the 1994 and 1996 Guaranties relates to the term "Guarantor." Although neither Guaranty contained a definition of the term, both provided that any undefined terms "shall have the respective meanings given therefor in the [applicable] Credit Agreement." (Defs.' Exs. F ¶ 1, I ¶ 1). The 1994 Credit Agreement, in turn, defined the term Guarantor by listing the five companies that had signed the 1994 Guaranty. (Defs.' Ex. I ¶ 10B).

The 1996 Credit Agreement defined the "Original Guarantors" as the seven entities that signed the 1996 Guaranty. With respect to the "Eligible Subsidiaries" that might subsequently become Guarantors, Paragraph 5L(a) of the 1996 Credit Agreement provided, insofar as relevant, as follows:

On each Liability Calculation Date each Eligible Subsidiary which shall be a Material Subsidiary as of such date (each, an "Eligible Material Subsidiary") and, in the event that the percentage of Consolidated Total Assets held by such Eligible Material Subsidiaries on such Liability Calculation Date shall be less than 90 %, each other additional Eligible Subsidiary whose Total Assets, together with the Total Assets of such other additional Eligible Subsidiaries and such Eligible Material Subsidiaries, equals or ex-

ceeds 90 % of Consolidated Total Assets on such date shall become, effective as of such Liability Calculation Date, ... a Guarantor under the Affiliate Guaranty on such Liability Calculation Date. The determination of which additional Eligible Subsidiaries shall become or continue to be Guarantors shall be made on the basis of the percentage of Consolidated Total Assets ... beginning with the additional Eligible Subsidiary with the largest such percentage and continuing until the percentage of Consolidated Total Assets held by all of the Guarantors on such Liability Calculation Date equals or exceeds 90 %.

(Defs.' Ex. K ¶ 5L(a)).

The term "Material Subsidiary" was defined in the 1996 Credit Agreement to include any Eligible Subsidiaries which held at least 5 % of the Consolidated Total Assets [3] of all of the Eligible Subsidiaries. (*See id.* ¶ 10B).

As a consequence of these provisions, after the first Liability Calculation Date, the Guarantors under the 1996 Credit Agreement included every Eligible Material Subsidiary of Inverraz. If those Eligible Material Subsidiaries did not collectively own 90 % of the Consolidated Total Assets of all of the Eligible Subsidiaries of Inverraz, then other Eligible Subsidiaries had to be added to the list of Guarantors— starting with the largest Eligible Subsidiary – until the 90 % threshold was met. (*Id.*).

### 3. *Negative Covenants*

In addition to requiring that there be Guarantors of the Inverraz indebtedness, State Street protected its financial investment through a series of restrictive covenants in the Credit Agreements. (Defs.'

Exs. G ¶ 6, K ¶ 6). Among other limitations, Inverraz agreed that it would sell its own assets and those of certain "Restricted Subsidiaries" only under limited circumstances and only if it was not, and would not thereby become, in default of its obligations under the loans. (Defs.' Exs. G ¶ 6(C)(4)(iv), (v), K ¶ 6(C)(4)(iv), (v)). The Credit Agreements defined the term "Restricted Subsidiary" to include "each of the Guarantors" and any other entity in certain countries, including Chile, of which Inverraz, either directly or indirectly through other Restricted Subsidiaries, owned 75 % or more of the voting stock or held a 75 % financial interest. (Defs. Exs. G ¶ 10B, K ¶ 10B). Although the guarantors did not sign the Credit Agreements, in each Guaranty they agreed to be bound by the terms of the relevant Credit Agreement. (Defs.' Exs. F, I ¶ 10).

### 4. *Participation Agreements*

At the time of both loan transactions, State Street entered into agreements with other lenders, known as participants, pursuant to which it sold its entire interest in the loans, but nevertheless remained responsible for their servicing and collection. (Defs.' Ex. N ¶ 4). Among other duties, State Street was specifically charged with making demands upon Inverraz and its Guarantors and enforcing the participants' rights. (*Id.* ¶¶ 4(a), (j)). State Street further agreed in each Participation Agreement that it would "not exercise any ... rights or powers [it] may have ... in respect of the Loan ... except at and in accordance with the written instruction of" participants owning more than 50 % of the participation interests. (*Id.* ¶¶ 4(j), 17). The Participation Agreements provided,

---

**3.** Both Credit Agreements defined "Consolidated Total Assets" as the aggregate tangible assets of Inverraz and its Restricted Subsidiaries on a consolidated basis. (Defs.' Exs. G at 27, K at 38).

however, that "[a]ll of the understandings and agreements contained in this Agreement are solely for the benefit of the [State Street] and the Participants and there are no other parties (including [Inverraz]) that are intended to be benefitted in any way or relieved of any obligations to [State Street] or any of the Participants."[4] (*Id.* ¶ 18).

### D.  *Inverraz's Default*

Inverraz made the payments required by the Credit Agreements through 1998. Beginning in 1999, however, Inverraz failed to make four consecutive semiannual installment payments. (Tr. 230–31). Initially, State Street agreed to defer the 1999 payments in exchange for a higher interest rate. (*Id.* at 44). Thereafter, on January 22, 2001, following Inverraz's continued failure to make its scheduled payments in 2000, (*id.* at 231), State Street accelerated Inverraz's entire indebtedness and demanded immediate repayment of all sums then due. (*Id.* at 44). Despite this demand, neither Inverraz nor any of its Guarantors has repaid any portion of Inverraz's substantial outstanding indebtedness since the notice of acceleration was sent. (*Id.* at 343).

### III.  *Procedural History*

Following Inverraz's default, State Street commenced this action by the filing of its complaint on April 16, 2001. (Docket No. 1). On June 27, 2001, the Court "so ordered" a stipulation pursuant to which the Defendants acknowledged personal jurisdiction and service; in return, State Street extended the Defendants' time to answer or move until June 19, 2001. (Docket No. 4). The stipulation extending time is somewhat unusual in two respects:

*first*, rather than appearing by counsel, the Defendants signed the stipulation themselves through their corporate officers (Tr. 117–18, 303–04); *second*, the date by which the stipulation required the Defendants to respond had already passed when it was filed (*id.* at 22). Notwithstanding the extension of time that they were afforded, over the next three months the Defendants neither answered nor moved with respect to the complaint.

On September 27, 2001, State Street moved for the entry of a default judgment. In an affidavit submitted in connection with this motion by one of its vice-presidents, State Street represented that the Defendants owed more than $55 million under the 1994 Credit Agreement and more than $78 million under the 1996 Credit Agreement, with interest under both Agreements continuing to accrue at the rate of more than $20,000 per day. (Affidavit of Fred Epstein, sworn to on Sept. 21, 2001, ¶¶ 41, 47). The Defendants were served with State Street's motion papers in the manner prescribed in the stipulation extending their time to answer, but submitted no opposition papers.

By order dated November 20, 2001, the Court granted State Street's motion. (Docket No. 13). Thereafter, on November 30, 2001, the Clerk of Court signed a default judgment which was entered on the Court's docket on December 4, 2001. (Docket No. 14). The default judgment awards the following relief:

(a) under the 1994 Credit Agreement and Guaranty, judgment in the amount of $57,283,874.86, together with prejudgment interest from November 1, 2001, at the rate of $20,011.63 per day, against defendants Inverraz, Supermercados Unimarc S.A., Pesquera National S.A.,

---

4.  Although the parties did not introduce into evidence a complete copy of the 1996 Participation Agreement, I assume, as have the Defendants, that the material terms of both Participation Agreements are identical. (*See* Defs.' Mem. at 75–87).

Unimarc Abastecimientos S.A., Cidef S.A., Salmones Unimarc S.A., Industria Forestal Nacional S.A., Forestal Regional S.A., and Corporacion De Inversiones Y Desarrollo Financiero Cidef S.A., jointly and severally;

(b) under the 1996 Credit Agreement and Guaranty, judgment in the amount of $79,180,000.12, together with prejudgment interest from November 1, 2001, at the rate of $21,599.47 per day, against defendants Inverraz, Supermercados Unimarc S.A., Pesquera National S.A., Unimarc Abastecimientos S.A., Cidef S.A., Salmones Unimarc S.A., Cidef Argentina S.A., Corporacion De Inversiones Y Desarrollo Financiero Cidef S.A., and Sociedad Contractural Minera Compania De Salitre Y Yodo Primera Region, jointly and severally; and

(c) an order directing that the named defendants "may not sell or transfer assets of Compania de Salitre y Yodo de Chile S.A., without plaintiff's prior consent."[5]

(*Id.*).

On November 8, 2001, the Law Office of Michael B. Wolk, P.C., served a notice of appearance in this action on behalf of all of the Defendants which apparently was not filed with the Clerk of the Court until December 15, 2001. (Docket No. 15). Thereafter, on December 19, 2001, Mr. Wolk moved, pursuant to Fed.R.Civ.P. 60(b), to vacate the default judgment. Rule 60(b) provides that a court may relieve a party from a final judgment for several reasons, including "mistake, inadvertence, surprise, or excusable neglect." To determine whether a default judgment resulted from excusable neglect, courts generally consider "(1) whether the default was willful, (2) whether defendant has a

meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted." *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir.1996)(quoting *Davis. v. Musler*, 713 F.2d 907, 915 (2d Cir.1983)). The burden of showing that vacatur is justified rests with the moving party. *Sony Corp. v. Elm State Elec.*, 800 F.2d 317, 320 (2d Cir.1986).

In their motion papers, the Defendants alleged that their long time United States counsel, Gibson, Dunn, & Crutcher ("Gibson, Dunn"), had unexpectedly abandoned them shortly after the filing of State Street's motion for a default judgment. (Defs.' Mem. 92–93). The Defendants further contended that they had eight potentially meritorious defenses or counterclaims that they wished to assert. (*Id.* at 75–120; Defs.' Reply Mem. 5–12).

On February 4, 2002, Your Honor issued an Opinion which indicated that the Defendants would likely be able to sustain their burden of showing that the default was not willful if they were able to establish that it was caused by their "good faith (if erroneous) expectation that Gibson, Dunn would continue to represent their interests in litigation against plaintiff" and "their attendant inability to find new [ ] representation." *State Street v. Inversiones Errazuriz Limitada*, 230 F.Supp.2d 313, 317 (S.D.N.Y.2002). Because the Defendants had not yet proffered sufficient evidence to establish that this was so, the wilfulness of the default was referred to me for further inquiry. *Id.* at *318. I also was directed to consider (a) whether there was a factual basis for certain of the Defendants' proposed counterclaims, and (b) whether State Street would suffer any unfair preju-

---

**5.** A corrected default judgment reflecting minor textual changes was entered on May 8, 2001. (Docket No. 38).

dice if the default judgment were vacated. *Id.* at 323.

Pursuant to the reference, I authorized certain limited discovery requested by the parties and then held an evidentiary hearing on May 23 and 24, 2002. At the hearing, the Defendants called four witnesses: Jorge Sims, the Chief Executive Officer and President of Inverraz; Senator Francisco Javier Errazuriz (the "Senator"), a member of the Chilean legislature, whose family controls the Inverraz group of companies; the Senator's son, Francisco Javier Errazuriz–Ovalle ("Francisco"), who is the General Manager of Inverraz; and Nelson Contador, a Chilean attorney who serves as outside counsel for the Inverraz group of companies. State Street's only witnesses were Conor D. Reilly and Blake Franklin, both of whom are partners at Gibson, Dunn.

My findings of fact and conclusions of law, based upon the testimony of these witnesses and the relevant exhibits, are set forth below.

IV. *Findings of Fact and Conclusions of Law*

A. *Wilfulness*

██ The relationship between Gibson, Dunn and Inverraz dates back to 1983, when the Senator arrived at Blake Franklin's office to seek assistance in the structuring of transactions to export fruit from Chile to the United States. (*Id.* at 8, 351). Over the next two decades, Franklin and his colleagues at Gibson, Dunn handled a variety of legal work for Inverraz in the United States. Among other assignments, Gibson, Dunn served as counsel to the Defendants in connection with both the 1994 and 1996 loans. (*Id.* at 8).

When State Street accelerated the Inverraz debt, the Defendants naturally looked to Franklin and his firm for help.

In late 2000, the Senator and Franklin met with representatives of State Street in New York City to discuss the possibility of restructuring Inverraz's obligations. (Tr. 10–11, 353–54). During these discussions, the Senator agreed that he would sell certain of Inverraz's assets in an effort to repay its past due debt. (*Id.* at 10–11). Over the next few months, Inverraz unsuccessfully attempted to close several such transactions. (*Id.* at 36, 293).

The parties' efforts to work out the loans continued even after this suit was filed in April 2001. Indeed, it appears that the parties were operating under an informal standstill agreement, pursuant to which State Street agreed not to pursue its remedies under the Credit Agreements and Guaranties in this lawsuit without giving the Defendants at least one week's advance notice. (*Id.* at 127).

The notion that the parties were proceeding cooperatively during this period is underscored by the stipulation extending the Defendants' time to respond to the Complaint. As noted earlier, the stipulation was submitted to the Court for its approval even though the date by which the Defendants were to respond had already expired. Indeed, the principal purpose that the stipulation appears to have served was not to set a date for the Defendants to answer or move, but, rather, to secure an acknowledgment that service was effective and establish a means by which subsequent papers could be served upon the Defendants' designated agent in the United States. As the Senator explained, the Defendants did not wish to serve an answer for fear that it would derail their ongoing discussions with State Street regarding a workout of the Inverraz loans. (*Id.* at 109).

On July 20, 2001, State Street's counsel sent a letter to Reilly which signaled the end of the litigation timeout and warned

that both State Street and another Inverraz creditor, the Bank of New York ("BONY"), might seek the entry of default judgments against the Defendants as early as the following week. Despite that notice, the two sides continued to engage in workout discussions. (*Id.* at 149). As a result, by early August, they appeared to have reached an agreement in principle, pursuant to which Inverraz would sell Cosayach's iodine and nitrates business to a competitor, Sociedad Quimica y Minera de Chile S.A. ("SQM"), and use a portion of the sale proceeds to repay State Street approximately $85 million plus $2 million in legal fees. (Tr. 59; Pl.'s Ex. 4). At or about the same time, the two sides were also discussing a possible sale of Inverraz's supermarket subsidiary to raise further funds for repayment of the loans. (Pl.'s Ex. 9).

Despite these discussions, the possibility that State Street might seek a default judgment always loomed. To make matters worse, whether Gibson, Dunn would represent the Defendants in this action was a matter within the purview of the firm's litigators, not lawyers, such as Franklin, who had a continuing business relationship with Inverraz and the Senator. As Reilly cautioned Jose Dulanto, Inverraz's in-house counsel, in a May 1, 2001, letter, Gibson, Dunn was unwilling to consider undertaking that assignment until "after [its] outstanding invoices have been paid." (Pl.'s Ex. 8).

There is a sharp dispute between the Senator and his former attorneys as to whether Gibson, Dunn was reluctant to enter the litigation fray because Inverraz was in arrears, because it knew of no potentially meritorious defense, or both. (Tr. 24, 116, 357–58). There is also a dispute as to whether Gibson, Dunn ever unequivocally told representatives of Inverraz that its litigators were unwilling to represent the Defendants in connection with this suit. (*Id.* at 116–19, 188). State Street points to the fact that Gibson, Dunn was unwilling to sign the stipulation extending Inverraz's time to respond to the complaint as evidence that Gibson, Dunn's position had been effectively communicated.

The central issue, however, is not what Gibson, Dunn communicated, but whether the Defendants' inaction went beyond "gross negligence" and amounted to a wilful default. *See Am. Alliance,* 92 F.3d at 61. As Your Honor recognized, this inquiry must focus, first, on whether the Defendants had a "good faith (if erroneous) expectation that Gibson, Dunn would continue to represent their interests in litigation ..." *State Street,* at 317. In that regard, Sims testified without contradiction that there is no distinction in Chile between corporate attorneys and litigators. (Tr. 218)("Normally the same lawyers handle both things."). If so, it appears reasonable for the Defendants to have assumed that their interests were being adequately protected by Gibson, Dunn throughout the lengthy period that the parties and their counsel were attempting to renegotiate the terms of the Inverraz loans. Although hindsight suggests that the Defendants would have been wise to begin seeking other counsel during this period, a good faith belief that an action will settle constitutes a reasonable basis for failing to interpose an answer. *See Gonzalez v. City of New York,* 104 F.Supp.2d 193, 196 (S.D.N.Y.2000)(Scheindlin, J)("defendant's counsel held the reasonable belief that the action would be settled, thereby obviating the need for a formal response"); *Whitman v. United States Lines,* 88 F.R.D. 528, 530 (E.D.Tex.1980)(defendants' failure to answer the complaint because of good faith belief that case would be resolved by ongoing settlement negotiations consti-

tutes "gross negligence," but nonetheless "excusable neglect").

By September 21, 2001, when the motion for a default judgment was filed, the situation clearly had escalated to the point that the Defendants had to take some steps to defend this suit. There is no indication that the Defendants instead opted to sit on their haunches. Quite to the contrary, as Franklin explained, when he and the Senator discussed whether it might be preferable for the Defendants not to appear, "[t]he Senator didn't agree with that and his Chilean counsel didn't agree with that." (Tr. 368; *see also id.* at 395–96).

In the course of their conversations in early October, Franklin also told the Senator that Inverraz would have to make a substantial payment to Gibson, Dunn so that Franklin could approach the litigators again about taking this case. (*Id.* at 369). That the Senator wished to pursue this course is persuasively demonstrated by his decision to wire transfer $200,000 from his financially-strapped company to Gibson, Dunn either that day or the following day. (*Id.;* Defs.' Ex. C). Given Inverraz's lengthy relationship with Gibson, Dunn, and the firm's familiarity with the underlying loan transactions, it is understandable that the Defendants would have preferred Gibson, Dunn to other counsel at this stage.

Moreover, the Defendants were not alone in their belief that Gibson, Dunn might relent and agree to represent them in this litigation. As Franklin testified, he too believed in early October that the payment of some of the fees that were in arrears would "convince the litigators to continue to represent a company that [he] thought was a very good client." (Tr. 386). Franklin also conceded during his testimony that the Senator may well have misinterpreted his request for the $200,000 as a request for a litigation retainer. (*Id.* 373).

In these circumstances, there is no reason to believe that the Defendants' initial failure to respond to State Street's motion for a default judgment is attributable to a tactical decision.

After Gibson, Dunn communicated its unwillingness to represent the Defendants in this case despite Inverraz's $200,000 payment, the Defendants promptly sought other counsel. Although Franklin had suggested to the Senator during a visit to Chile in May 2001 that Gibson, Dunn would be able to suggest other law firms if the need arose, it does not appear that he followed through. Instead, Inverraz apparently was provided only with contact information for Your Honor's Chambers. (*Id.* at 286). The notion that a corporate borrower which had arrearages of nearly $140 million could realistically have sought relief through a telephone call or *pro se* letter to the Court is plainly not tenable. Accordingly, it is not surprising that neither State Street's counsel nor the Court heard from the Defendants for several weeks while they were searching for counsel.

Although neither side established the precise date, it is undisputed that the Defendants next contacted Oliver Armas, an attorney with Thacher Proffitt & Wood. (*Id.* at 31). In late October, the Thacher, Proffitt firm agreed to represent the Defendants, but soon concluded that it had a conflict in interest. (*Id.*). Thereafter, in early November, the Defendants retained their present counsel, Michael B. Wolk. (*Id.* at 32). Mr. Wolk served his notice of appearance on November 8, 2001, and sought to file further papers seeking to vacate the default judgment on December 17, 2001, the day after the automatic ten-day stay of enforcement expired. *See State Street*, at 317 n. 2. After those motion papers were rejected, Mr. Wolk sub-

mitted further papers on December 19th. (Docket Nos. 16–20).

In short, less than one month after it became clear that Gibson, Dunn would not appear in this action, Mr. Wolk filed a notice of appearance. Some six weeks later, Mr. Wolk filed an extensive motion to vacate the default judgment. This motion was filed only two weeks after the default judgment actually was entered on the Court's docket and only a few days day after the automatic stay of enforcement expired on Friday, December 14, 2001.

Although State Street has criticized the pace of the Defendants' response to this suit, it is clear that the Defendants were faced with some unusual hurdles. First, each of the Defendants evidently is based in Chile and there is no indication that they had any representatives in the United States who were in a position to expedite their search for substitute counsel once Gibson, Dunn made it clear that it would not file a notice of appearance. Second, despite the fact that Franklin indicated to the Senator that he would, if necessary, find another law firm to appear on the Defendants' behalf, (Tr. 359), it does not appear that Gibson, Dunn ever furnished the Defendants with the names of any firms which might be able to assume their defense. Third, the complexity of the transactions giving rise to this suit meant that the law firms that could be approached were necessarily limited. Fourth, because the Senator and his colleagues are not native English speakers, it obviously was desirable that they secure counsel who could deal effectively with cross-border issues. Like Gibson, Dunn, Thacher, Proffitt appeared to fill that need.[6] Fifth, although they ultimately were able to retain Mr. Wolk, the Defen-

dants' financial straits probably complicated their search. Finally, it is clear from the hearing that neither Mr. Wolk nor the only other attorney assisting him (his father, Edmund Wolk) is fluent in Spanish. The significant geographical and language constraints that Mr. Wolk faced, as well as the small size of his firm, undoubtedly affected his ability to mobilize quickly to contest the entry of the default judgment.

In these circumstances, it seems apparent that the Defendants' delay in responding to this action, even if negligent, cannot be characterized as "wilful." The Defendants have therefore met their burden with respect to this first element of the showing necessary to vacate the default judgment.

### B. Meritorious Defense or Counterclaim

After concluding that the Defendants' first counterclaim lacked merit, Your Honor asked me to consider the merits of their seven remaining counterclaims. As set forth in your Opinion, those counterclaims are as follows:

Second, defendants claim that plaintiff has engaged in activity that constitutes a breach of its implied obligation of good-faith and fair dealing under the Credit and Guaranty Agreements. [ (Defs.' Mem.)] at 112. Third, defendants allege that plaintiff has engaged in knowing, intentional, and/or tortious interference with defendants' contractual relations, business operations, and prospective economic advantage. *Id.* at 113–16. Fourth, defendants accuse plaintiff of having made fraudulent and/or negligent misrepresentations regarding their rights under the Credit and Guaranty

---

**6.** The Court takes judicial notice that Thacher, Proffitt has a Latin American Practice Group and that Mr. Armas, with whom the

Defendants consulted, is apparently fluent in Spanish. (*See http://www.thacherproffitt.com* (last visited July 29, 2002)).

Agreements. *Id.* at 116–17. Fifth, defendants claim that plaintiff has breached its fiduciary duty owed under the Credit and Guaranty Agreements. *Id.* at 118–120. Sixth, defendants argue that plaintiff's suit against them is defective because it violates the conditions for bringing suit set forth in the Credit and Guaranty Agreements. *Id.* at 75. Seventh, defendants contend that the default judgment filed by plaintiff is defective because it contains a declaratory ruling that restricts the assets of a company that is not even a party to the lawsuit. (Defs.' Reply Mem. at 5–9.) Eighth and finally, defendants contend that the default judgment is defective because it awards damages against four defendants who are not guarantors under either the 1996 or 1994 Credit Agreements, and two other defendants who are not Guarantors under the 1996 Agreement. *Id.* at 10.

*State Street,* at 322. Each of these counterclaims is considered below.

### 1. *Tortious Interference*

#### a. *SQM*

Several of the Defendants' counterclaims arise out of State Street's allegedly improper conduct in connection with Inverraz's proposed sale of Cosayach's nitrate and iodine assets to SQM. After extensive negotiations, Inverraz and SQM apparently reached an agreement in principle regarding this sale. (Tr. 11–12). Accordingly, as required by Chilean law, SQM notified the Chilean government of its intent to complete the transaction at a cost of approximately $140 million. (*Id.* at 18; Defs.' Ex. M).

Following the SQM filing, BONY filed an action in Supreme Court, New York County, on March 26, 2001, to recover from Inverraz approximately $40 to 50 million of indebtedness then due and owing under an unrelated credit agreement. (Tr. 50, 221; Pl.'s Ex. 1). BONY was represented in this action by Debevoise & Plimpton, the same firm that State Street had retained in connection with its dealings with Inverraz. In addition, BONY had separate counsel in Chile. After the state court suit was filed, BONY's Chilean counsel forwarded a copy of the complaint to SQM. (Tr. 221–22). At the very next meeting between Inverraz and SQM, the SQM representatives indicated that they would not complete the Cosayach transaction without the "written permission of those who had started the lawsuit." (*Id.* at 189–90; *see also id.* at 223).

A copy of the complaint in this action subsequently was forwarded to SQM in April 2001. In that complaint, State Street alleges that the completion of the proposed Cosayach transaction with SQM would violate both the 1994 and 1996 Credit Agreements because Inverraz had agreed not to sell the assets of Inverraz or certain of its subsidiaries, termed Restricted Subsidiaries, while Inverraz was in default. (Compl.¶¶ 42–44). In addition to this averment, the Defendants apparently contend that State Street "affirmatively warned" SQM that the proposed Cosayach transaction could not take place without its prior consent. (*See* letter from Michael B. Wolk, Esq. to the Court, dated June 12, 2002, at 4). The Defendants also allege that, after having been threatened by both State Street and BONY, SQM chose to condition the Cosayach transaction on the consent of both banks because it did not want to jeopardize its relationships with American financial institutions. (*Id.;* Tr. 57).

By letters dated April 24 and 26, 2001, Inverraz promised State Street's counsel that it would not sell any of Cosayach's assets to SQM without securing State Street's prior consent. (Tr. 54; Pl.'s Ex.

2). Although the negotiations among Inverraz, SQM, and the lenders then continued, (*see, e.g.,* Tr. 62; Pl.'s Ex. 5), on October 5, 2001, SQM notified Inverraz that it was unwilling to proceed to a closing. (Tr. at 36, 67; Pl.'s Ex. 6). At the hearing, the Senator testified that the deal fell through because BONY and State Street unreasonably withheld their consent. (Tr. at 66).[7]

### b. *Tamaya Corporation*

The Defendants allege that State Street also interfered with Cosayach's relationship with Tamaya Corporation, the largest distributor of iodine in North America. Under BONY's contractual arrangements with Inverraz, certain Inverraz receivables attributable to export sales, including sales of iodine by Cosayach, had to be placed into a trust. (Tr. 326–27). The proceeds of domestic sales, however, were not subject to this restriction. (*Id.* at 327). After State Street declared its loan in default, BONY invoked a cross-default provision in its loan documentation. (*Id.* at 327–28). It appears that Tamaya then ceased making iodine purchases directly from Cosayach. Instead, Tamaya began to purchase its iodine through intermediaries in Chile. Those intermediaries would purchase the iodine required to fulfill Tamaya's needs through "local" purchases from Cosayach in Chile. In this manner, Cosayach was able to avoid depositing the sales proceeds into the trust. (Pl.'s Ex. 13).

Although the Defendants allege that Inverraz's lenders at some point notified Tamaya (through Debevoise & Plimpton) that it was running a "big risk" if it purchased iodine by this means, (*id.* at 295), the documents paint a considerably different picture. After the issue arose, Tamaya's United States counsel sent Debevoise & Plimpton a letter, dated May 21, 2001, which asked whether Inverraz's lenders had any objections to Tamaya's purchases of Cosayach's iodine through local Chilean intermediaries. Among the specific inquiries that Tamaya's counsel made was:

1. Do the investors you represent object to sales of iodine produced by Cosayach to "local" Chilean companies and the resale of such Cosayach iodine to third parties . . . , payment being made as directed by such Chilean companies? If so, please provide us the legal basis for that objection. Please provide us copies of all documents upon which you rely in reaching your conclusions.

(Pl.'s Ex. 13). In response to this letter, Debevoise & Plimpton indicated that it was not authorized to take a position. As an alternative, the firm suggested that Tamaya's counsel confer with Cosayach or Inverraz, noting that the lenders had no objection to those entities furnishing Tamaya with copies of the relevant loan documentation. (Pl.'s Ex. 14; *see also* Pl.'s Exs. 15, 16). The Defendants' present criticism of this response, (*see* Tr. 335), is markedly different than their earlier reaction. At the time, Inverraz's Chief Executive Officer wrote to Debevoise & Plimpton: "We completely agree with the position that Debevoise has taken so far with respect to Tamaya." (Pl.'s Ex. 17).

### c. *Analysis*

The Defendants' first contention with respect to their tortious interference counterclaim is that State Street improperly obstructed the proposed sale of Cosayach's assets to SQM by insisting that State Street's consent be secured. Under New York law, to establish tortious interference with a prospective contract a party must

---

**7.** The letter from SQM terminating further discussions references both "internal and external" difficulties that precluded the sale. (Pl.'s Ex. 6).

show: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Astor Holdings, Inc. v. Roski*, No. 01 Civ.1905, 2002 WL 72936, at \*19 (S.D.N.Y. Jan. 17, 2002)(Lynch, J.)(internal citations omitted).

The Defendants argue that Cosayach was not a Guarantor at the time of the proposed sale of its assets to SQM and therefore could not be required to secure State Street's consent. The issue, however, is not whether Cosayach was a Guarantor, but whether Cosayach was a "Restricted Subsidiary." As noted above, under the Credit Agreements, so long as it was in default, Inverraz was prohibited from selling the assets of any Restricted Subsidiary—a term which was defined to include any Chilean company of which Inverraz either directly or indirectly owned 75 % of the voting stock or held a 75 % financial interest. (Defs.' Exs. G & K § 10B).

At the hearing, Sims conceded that Cosayach was a Restricted Subsidiary of Inverraz. (Tr. 202 ("Cosayach first region was still a restricted subsidiary of Inverraz[,] with more than 95 percent of the ownership concentrated in Inverraz"), 234 ("Cosayach is a restricted subsidiary")). Moreover, Inverraz was unquestionably in default at the time of the proposed sale of Cosayach's assets to SQM. (*Id.* at 232). Consequently, State Street plainly had the right to insist that no sale of Cosayach's assets occur without its permission. State Street's insistence that Inverraz comply with its contractual obligations also obviously did not stem from an impermissible desire to hurt Inverraz, but, rather, was simply intended to protect its substantial financial investment.

Moreover, even if State Street did not have a contractual right to bar the sale, the Defendants' tortious interference claim with respect to SQM still would fail because there has been no showing that State Street's actions were the proximate cause of the Defendants' loss. As Sims admitted, "SQM was very clear from the first time they had the claim from [BONY] that this is the way it should be." (Tr. 223). It follows that the tortious interference that the Defendants seek to prove was not caused by State Street, but by BONY. *See Turk v. Angel*, 293 A.D.2d 284, 740 N.Y.S.2d 50, 51 (1st Dep't 2002)(claims for tortious interference properly dismissed where "plaintiffs would not be able to demonstrate that defendants' conduct was the proximate cause of their alleged loss").

The Defendants' tortious interference counterclaim arising out of State Street's dealings with Tamaya is no more meritorious. All that State Street is alleged to have done with respect to Tamaya is decline to lend its counsel's imprimatur to an apparent end run around the trust arrangement established by BONY with respect to Cosayach's international sales. The suggestion that the failure to give such assurances to a third party is somehow wrongful is particularly misplaced in light of Inverraz's contemporaneous observation that it fully agreed with the approach taken by State Street's counsel. (Pl.'s Ex. 17).

### 2. *Fraudulent or Negligent Misrepresentation*

The Defendants also allege that State Street made certain fraudulent or negligent misrepresentations in connection with its alleged tortious interference. In support of this counterclaim, the Defendants have proffered an affidavit in which Francisco avers, in conclusory fashion, that

State Street made such misrepresentations. (Affidavit of Francisco Javier Errazuriz–Ovalle, sworn to on December 14, 2001, ¶ 79). Despite that conclusory assertion, the Defendants have failed to identify any actual misrepresentations made by State Street or its counsel. This, of course, precludes any finding that the Defendants have a meritorious negligent misrepresentation counterclaim. *See Simon v. Castello*, 172 F.R.D. 103, 105–06 (S.D.N.Y.1997)(Batts, J.)(Fed.R.Civ.P. 9(b) is applicable to negligent misrepresentation claims; accordingly, complaint which did not attribute any misleading statement to a defendant failed to state claim for fraud and negligent misrepresentation).

### 3. *Good Faith and Fair Dealing*

■■ The Defendants further allege that State Street somehow breached its implied contractual obligation of good faith and fair dealing through its conduct with respect to SQM and Tamaya. In that regard, New York law

> recognizes that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing."

*Bank of New York v. Sasson*, 786 F.Supp. 349, 353 (S.D.N.Y.1992)(Mukasey, J.) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933)). However, "the implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)(per curiam)(quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden*

*Publ'g Co.*, 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972)). Similarly, the implied covenant cannot prevent a party from exercising a right that it has specifically been accorded pursuant to the contract. *See Canpartners Invs. IV v. Alliance Gaming*, 981 F.Supp. 820, 824 (S.D.N.Y.1997)("[I]t is axiomatic that an implied covenant must comport with the parties' intent and be consistent with the written provisions of the contract."). *Cf. Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 679 (2d Cir.1985)(UCC good faith provision may not be used to override explicit contractual provisions); *Corenswet, Inc. v. Amana Refrig. Inc.*, 594 F.2d 129, 138 (5th Cir.1979)(same).

In this case, the Defendants have adduced no evidence which indicates that State Street improperly denied Inverraz the fruits, or otherwise defeated the purpose, of any of the contracts among the parties. While Inverraz may have believed that State Street's approach was unreasonable, there has been no showing that State Street took any action contrary to the Credit Agreements or Guaranties. It follows that the Defendants have not established any breach of the implied covenant of good faith and fair dealing. *See Sasson*, 786 F.Supp. at 354 ("so long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest such as extending, or even renegotiating the possible extension of, a risky loan").

### 4. *Fiduciary Duty*

■ The Defendants further allege that State Street breached its fiduciary duty to Inverraz and the Guarantors. It is settled law, however, that a bank does not have a fiduciary duty to its borrowers. *See Aaron Ferer & Sons Ltd. v. Chase Man-*

hattan Bank, 731 F.2d 112, 122 (2d Cir.1984)(under New York law, "usual relationship of bank and customer is that of debtor and creditor" and bank owes no fiduciary duty to borrower); In re W.T. Grant Co., 699 F.2d 599, 612 (2d Cir.1983); Weinberger v. Kendrick, 698 F.2d 61, 79 (2d Cir.1982)(Friendly, J.)("it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table"); Sec. Nat'l Bank v. DeSeguros, 21 Misc.2d 158, 161, 190 N.Y.S.2d 820 (1959)(guarantors must "look out for themselves"). See also Marine Midland Bank v. Smith, 482 F.Supp. 1279, 1287 (S.D.N.Y.1979)(Sand, J.)(same).

Notwithstanding this established principle, the Defendants urge this Court to find that a fiduciary duty existed here on the basis of Judge Chin's decision in Scott v. Dime Sav. Bank of New York, FSB, 886 F.Supp. 1073 (S.D.N.Y.1995), aff'd., 101 F.3d 107 (2d Cir.1996). In that case, the defendant bank's conduct went far beyond the usual creditor-debtor relationship. For example, the bank induced the plaintiffs to borrow twenty times more money than they originally intended, and to invest much of the loan proceeds through a brokerage firm which was a bank affiliate. Id. at 1075. Faced with evidence of this conduct, Judge Chin properly instructed the jury that, in "special circumstances ..., a fiduciary relationship will arise between a bank and a customer if there is a confidence placed in the bank that gives it an advantage in dealing with the customer who is placing his trust in the bank." Id. at 1078 n. 7. One such special circumstance was the fact that "dual employees" of the bank and its brokerage affiliate were advising the plaintiffs about their stock purchases. See id. at 1079 (noting that stockbrokers may owe fiduciary duties to their customers under New York law).

Unlike Scott, the Defendants in this case have failed to show any special circumstances which would suggest that a fiduciary relationship existed between State Street and the Defendants. Indeed, the Defendants are part of a substantial international enterprise and were represented by a multinational law firm during most, if not all, of their dealings with State Street. When parties to a commercial transaction deal at arms length, there is no basis to impute a fiduciary obligation in the manner that the Defendants now suggest. See Greenberg v. Chrust, 198 F.Supp.2d 578, 583 (S.D.N.Y.2002) (Sweet, J.)(collecting cases). The proposed fiduciary duty counterclaim therefore lacks any factual or legal basis.

5. *Failure to Fulfill Condition Precedent*

The Defendants next allege that State Street, having sold its entire beneficial interest in both the 1994 and 1996 loans, lacks standing to bring this lawsuit on behalf of the participants. More specifically, the Defendants contend that State Street failed to comply with a condition precedent in the Participation Agreements that required that the holders of more than 50 % of the participation interests agree, in writing, before any suit was filed. This contention is wrong on both the facts and the law. First, at the hearing, State Street introduced without objection two "Written Directions" which appear to have been signed by the requisite number of participants. (See Pl.'s Exs. 19, 20). Second, each of the Participation Agreements specifically provides that

> the understandings and agreements contained in this Agreement are solely for the benefit of [State Street] and the Participants and there are no other parties (including [Inverraz]) that are intended to be benefitted in any way or

relieved of any obligations to [State Street] or any of the Participants. (*Id.* ¶ 18). Thus, even if the participants had not previously agreed in writing to the institution of this action, the Defendants plainly are not third-party beneficiaries of the Participation Agreements, and cannot rely upon any alleged breach of them.

■ In an effort to suggest that they have standing to pursue this claim, the Defendants cite two lines of authority, neither of which is germane. The first consists of cases in which the plaintiff failed to comply with a contractual condition precedent before bringing suit against another party *to the same contract. See, e.g., Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.,* 865 F.2d 513, 518 (2d Cir.1989)(contract between parties required notice of termination). The second group involves suits instituted by an individual trust beneficiary in violation of the trust agreement. *See, e.g., Allen v. Pierson,* 113 A.D. 586, 100 N.Y.S. 451 (4th Dep't 1906)(beneficiary could not maintain foreclosure action without participation of trustee or majority in amount of claim holders as trust agreement required). Here, in marked contrast to these cases, the Participation Agreements expressly state that the Defendants are not beneficiaries of the understandings between State Street and the participants. Accordingly, even if the Participation Agreements were violated, the Defendants lack any basis to complain.

### 6. *Improper Declaratory Language*

The Defendants also contend that the default judgment improperly restricts the assets of Compania de Salitre y Yodo de Chile S.A. ("Cosayach Chile"), a company that is not a party to this litigation.[8] (Defs.' Reply Mem. at 5–9). Insofar as

relevant, the default judgment provides that, "under the terms of the 1994 [Credit] Agreement, the 1996 [Credit] Agreement, the 1994 Guaranty and the 1996 Guaranty, the *defendants* may not sell or transfer the assets of [Cosayach Chile] without plaintiff's prior consent." (Docket No. 38)(emphasis added). The Defendants' protestation that this language impermissibly restricts the rights of a nonparty misses the mark. By its express terms, the default judgment does not restrict Cosayach Chile in any respect. Rather, the only entities that are restricted from transferring any assets are the "[D]efendants."

### 7. *Improper Guarantors*

The final "counterclaim" asserted by the Defendants is that certain of them are not in fact Guarantors of the Inverraz indebtedness. (Defs.' Reply Mem. at 10–15). There are two aspects to this claim. First, with respect to the 1996 Guaranty, the Defendants contend that Cosayach and Salmones are not Guarantors. (*Id.* at 13; Tr. 182). Second, the Defendants contend that certain new entities created through tax-motivated transactions, known in Chile as ecisíones, are not Guarantors. (Defs.' Reply Mem. at 10–11; Tr. 256–57).

■ The argument that Cosayach and Salmones are not Guarantors proceeds on the mistaken assumption that the only companies that should be deemed Guarantors on any given Liability Calculation Date are those that are necessary to ensure that Inverraz's indebtedness under the 1996 Credit Agreement is guaranteed by 90 % of the Consolidated Total Assets of all of the Eligible Subsidiaries. Under paragraphs 5L and 10B of the 1996 Credit Agreement, in addition to the Original

---

**8.** Although Cosayach Chile appears to be a different entity than Cosayach, the parties have not explained the relationship between the two.

Guarantors, each Inverraz subsidiary that qualified as an Eligible Material Subsidiary as of a Liability Calculation Date became an additional Guarantor. The 1996 Credit Agreement, by which each Guarantor of the 1996 loan agreed to be bound, defined the term "Eligible Material Subsidiary" to include any Inverraz subsidiary which held more than 5 % of the Consolidated Total Assets of all of the Eligible Subsidiaries. Thus, any Eligible Material Subsidiary is necessarily a Guarantor. Moreover, the 1996 Guaranty mandated that any Eligible Subsidiary required to serve as a Guarantor would become a party to the Guaranty. (Defs.' Ex. F ¶ 26).

At the hearing, Sims presented Inverraz's differing interpretation of the relevant loan documentation. He suggested, in substance, that the 1996 Credit Agreement and Guaranty together provided that only those Eligible Subsidiaries needed to ensure that Guarantors collectively held 90 % of the Consolidated Total Assets of all of the Eligible Subsidiaries were required to serve as Guarantors as of any Liability Calculation Date. (Tr. 177, 183; Pl.'s Ex. 13). Thus, if Inverraz's largest Eligible Subsidiary held 90 % of the Eligible Subsidiaries' Consolidated Total Assets on a Liability Calculation Date, only that subsidiary would be required as a Guarantor. (Id. at 183). On the other hand, if the largest Eligible Subsidiary held less than 90 % of those assets, other Eligible Subsidiaries would have to be added to the list of Guarantors—from the largest to the smallest—until the 90 % threshold was met.

In support of this reading, the Defendants pointed to a schedule submitted to State Street in February 2000. (*See* Pl.'s Ex. 12). By means of that schedule, In-

verraz had represented to State Street, without objection, that the only Guarantors under the 1996 Guaranty as of that date were four Eligible Subsidiaries that held 90 % of the Consolidated Total Assets of all of the Eligible Subsidiaries. The schedule indicated as follows:

| Eligible Subsidiary | Percentage of Consolidated Total Assets |
|---|---|
| Supermercados Unimarc S.A. | 37.2% |
| Cidef S.A. | 27.2% |
| Cidef Argentina S.A. | 16.3% |
| Pesquera Nacional S.A. | 15.0% |
| Cosayach 1st Region | 11.4% |
| Salmones | 5.5% |

(*Id.* Sched. I). As State Street accurately points out, Inverraz's calculations appear to be incorrect on their face because the allocable percentages suggested for the six Eligible Subsidiaries total 112.6 %.[9]

Based upon its calculations, Inverraz identified the Guarantors under the 1996 Guaranty and their Attributable Liability as of January 1, 2000 as follows:

| Guarantor | Attributable Liability (U.S. $) |
|---|---|
| Supermercados Unimarc S.A. | 25,230,328 |
| Cidef S.A. | 18,494,155 |
| Cidef Argentina S.A. | 11,081,729 |
| Pesquera Nacional S.A. | 10,193,788 |

(Pl.'s Ex. 12 at 1).

In advancing the argument that only the four "above-the-line" Eligible Subsidiaries were Guarantors as of January 1, 2000, the Defendants overlook the fact that, by their own calculations, all six of the Eligible Subsidiaries on Inverraz's schedule held more than 5 % of the Consolidated Total Assets of the Eligible Subsidiaries and therefore qualified as Eligible Material

---

9. According to documents submitted by State Street at oral argument, the correct figures are: Supermercados, 29.85 %; Cidef, 21.88 %; Cidef Argentina, 13.11 %; Pesquera Nacional, 12.06 %; Cosayach, 9.13 %; and Salmones, 4.43 %.

Subsidiaries. As such, pursuant to Paragraph 5L(a) of the 1996 Credit Agreement, all six entities were necessarily Guarantors of the 1996 indebtedness, irrespective of the 90 % threshold.[10]

Turning to the Defendants' other "Guarantor" argument, it is undisputed that three Inverraz subsidiaries engaged in ecisíones under Chilean law. An ecisíon is a transaction pursuant to which one company is divided into two, with the original company retaining its own name and most of the corporate assets and liabilities. (Tr. 245). As part of the process, the original company's tax losses are transferred to the new entity. (*Id.* at 245–46). Although both the original company and the new company remain liable for any preexisting obligations, (*id.* at 253), the ecisíon creates an opportunity for the transferee of the tax losses to merge with another more profitable company to lower the tax burden of the latter company. (*Id.* at 245–46).

The evidence at the hearing indicates that Inverraz engaged in the following ecisíones:

| Old Company | New Company | Date |
|---|---|---|
| Pesquera Nacional S.A. | Inversion Nacional S.A [11] | 2/16/98 |
| Salmones Unimarc S.A. | Inversiones Unimarc S.A | 4/30/98 |
| Industria Forestal Nacional S.A. | Forestal Regional S.A. | 1/19/98 |
| . | Corporacion de Inversiones y Desarrollo Financiero | |

Cidef S.A.  Cidef S.A.  7/4/00

(Tr. 246–50; Pl.'s Exs. 22, 23, 25, 26).

The Defendants contend that the new companies created by the ecisíones are not proper Guarantors because State Street orally agreed to look only to the original companies as a repayment source. With respect to this alleged arrangement, Sims testified as follows:

Q Well, do you know whether the lenders were informed of the ecis[í]on and given a representation that the new entities would remain liable for the obligations of the old entities?

A They were informed that they had the option, according to the Chilean law and according to the document that establishes the ecis[í]on, ... also to have as guarantors both companies that will come out of this division. But they also knew that one of these two companies were just tax losses, since there had been changes in the tax ID number ... the lenders opted so there should be shareholders meetings of these new companies ratifying the previous guarantees.

Q Both new companies?

A ... [N]o, not both companies, the real company, not—they didn't want the other one. The real company, the big one, the company that owned the asset not the taxes.

\* \* \* \* \* \*

Q Do you have any communications to the lenders reflecting that they opt-

---

**10.** If the Court were to adopt State Street's alternative calculations, Salmones would not qualify as an Eligible Material Subsidiary because it held only 4.43 % of the Consolidated Total Assets. Under those calculations, however, the five largest Eligible Subsidiaries collectively held only 86.03 % of the Consolidated Total Assets of the Eligible Subsidiaries. Under the 1996 Credit Agreement, State

Street therefore was entitled to look to the next largest Eligible Subsidiary—Salmones— as a Guarantor to ensure that the loan was secured by Guarantors holding 90 % of the Consolidated Total Assets of all of the Eligible Subsidiaries.

**11.** Inversion Nacional S.A. later changed its name to Unimarc Abastecimientos S.A.

ed for one company versus both companies?

A I don't know. I don't remember exactly. That was many years ago, but I know that we talked with them, and we made the shareholder meeting and we send them everything.

(Tr. 256–57). Apart from this testimony, Inverraz provided no details whatsoever concerning this alleged understanding between the Defendants and State Street.

Paragraph 21 of each Guaranty states, in part, that "[a]ll covenants and other agreements herein by or on behalf of each Guarantor shall bind its successors, whether so expressed or not." Similarly, Paragraph 25 of each Guaranty states that the Guaranty may not be amended without State Street's "written consent." In light of these contractual protections, and having observed the witnesses who testified at the hearing, I do not credit the Defendants' unsupported suggestion that State Street orally agreed not to hold the new companies resulting from the ecisíones liable as Guarantors. Moreover, even if some State Street officer did make a statement to that effect, Paragraph 25 of the Guaranty establishes that the Defendants could not reasonably rely on it in the absence of an appropriate writing.

In sum, there is no basis for either of the arguments advanced by the Defendants regarding the proper Guarantors.

### C. Prejudice

██ The Defendants' failure to prove a meritorious defense alone dictates that the default judgment must remain in place. *Nat'l Union Fire Ins. Co. v. Allard*, No. 87 Civ. 5368, 1989 WL 71168, at *1 (S.D.N.Y.1989)("Before a default judgment will be vacated, [the defendant] must dem-

onstrate a meritorious defense to the complaint."); 12 James Wm. Moore, et al., *Moore's Federal Practice*, ¶ 60.24[1] ("A precondition of relief from judgment is that the movant show that he or she has a meritorious defense."). Nevertheless, because the issue of prejudice was also referred to me, I have considered whether State Street would suffer an impermissible level of prejudice if the default judgment were vacated.

The delay in enforcement resulting from the vacatur of a default judgment does not, by itself, give rise to an impermissible level of prejudice. Instead, "it must be shown that delay will result in the loss of evidence, create increased difficulties in discovery, or *provide greater opportunity for fraud or collusion.*" *Davis*, 713 F.2d at 916 (quoting 10 Charles Alan Wright, et al., *Federal Practice and Procedure*, ¶ 2699, at 536–537)(emphasis added).

At the Defendants' request, prior to the evidentiary hearing, I required State Street to detail in an interrogatory answer how it would be prejudiced by a vacatur of the default judgment. In its response, State Street identified a lengthy series of allegedly improper transactions involving Cosayach and its subsidiaries. (*See* Defs.' Ex. O). At the evidentiary hearing, Sims conceded that each of these transactions had in fact occurred after Inverraz defaulted on its loan payments in or around April 2000.[12] (Tr. 232). Sims nevertheless maintained that none of the transactions violated the Credit Agreements. (*Id.* at 227). As shown previously, however, because Cosayach was a Restricted Subsidiary, each of these post-default transactions unquestionably violated the terms of the Credit Agreements.

---

**12.** Although Inverraz had failed to make required loan payments as early as March 1999, State Street had agreed to defer the payments that were due that year. (Tr. 230–31).

Several of the transactions identified by State Street are particularly troubling. As the Defendants conceded at the hearing, shortly after Inverraz missed its November 2000 loan payment, Cosayach and three of its subsidiaries transferred control of certain of their assets to Holandaus, an entity not part of the Inverraz group in which the Senator has some unspecified financial interest. (Tr. 237–39). The Cosayach subsidiaries that sold the assets all were Restricted Subsidiaries, (*id.* at 240), which were prohibited from effecting such transfers without State Street's consent while Inverraz was in default. Among the assets sold were two chemical plants and some mining properties. (*Id.* at 238). It is clear that these were not inconsequential transactions since Sims admitted that the assets conveyed represented approximately 20–30 % of Cosayach's total assets. (*Id.* at 239).

Subsequently, in the fall of 2001, Holandaus reconveyed these same assets to the Cosayach subsidiaries. (*Id.* at 241). In late October 2001, however, the three subsidiaries issued stock to Holandaus which gave Holandaus a controlling interest in all three subsidiaries. (*Id.* at 241); *see also* Ex. O at 4 (Int.Nos. 4(s)-(u)). Although Francisco described this odd series of transactions as an exchange of debt for equity which redounded to the benefit of Inverraz and Cosayach, (Tr. at 318–19), the fact remains that substantial assets of Cosayach were transferred out of the Inverraz group in violation of the Credit Agreements and without State Street's consent. (*See id.* at 239, 322). Moreover, those assets are now located in a company affiliated with the Senator.

Following the evidentiary hearing, State Street submitted a letter to the Court suggesting that Inverraz's misconduct with respect to its subsidiaries' assets was continuing. (*See* letter from Joseph P. Moodhe, Esq., to the Court, dated July 17, 2002, at 2)(alleging, *inter alia,* that control of another Cosayach subsidiary's assets was effectively transferred to Holandaus just weeks after the hearing). State Street subsequently indicated, however, that it "was requesting the Court to re-open the record only if the Court was inclined ... to recommend granting the [Defendants'] motion." (*See* letter from Mr. Moodhe to the Court, dated July 22, 2002).

In response to the first letter from State Street's counsel, the Defendants objected to the Court's consideration of any of State Street's new allegations without affording the Defendants "a reasonable period of time to present appropriate evidence, which, I am advised, will refute and discredit the plaintiff's assertions." (*See* letter from Michael E. Wolk, Esq., to the Court, dated July 18, 2002 ("Wolk 7/18 Letter"), at 1)(block capitalization deleted). The Defendants also argued that State Street was trying to have "all [the] Chilean entities ... conveniently 'lumped together' ..., regardless of whether such Chilean entities signed the contracts which are the subject of this lawsuit, or otherwise have any monetary obligations to [State Street]." (*Id.* at 4). Despite their request for additional time, the Defendants have never responded to the substance of State Street's accusations regarding these additional transactions.

It is not necessary to address State Street's post-hearing allegations in order to resolve the question of potential prejudice to State Street. The July 18th letter from Mr. Wolk contends that there is a "fierce factual and legal dispute" as to whether Cosayach is a Guarantor or Restricted Subsidiary and, even if it is, can be bound by loan documentation that it never signed. (*Id.* at 2). As Mr. Wolk notes, "*[i]f* [Cosayach] is not a Guarantor—or if

that issue cannot be conclusively determined on the Record to date—then there is no 'impermissible level of prejudice' to [State Street], on the vacatur motion, from any transactions involving [Cosayach]." (*Id.*)(emphasis added). As noted earlier, however, Cosayach *is* a Restricted Subsidiary, and the transactions that it undertook with Holandaus consequently are clear violations of the restrictive covenants set forth in the 1996 Credit Agreement. Since the Defendants continue to ignore the plain language of their agreements, as well as the negative covenants designed to protect State Street's investment, there obviously is a substantial risk that such impermissible transactions will continue in the future if the default judgment is vacated. Accordingly the Defendants have not met their burden of establishing a lack of prejudice. *See ARA Serv., Inc. v. Olympia Vending & Amusement Corp.,* No. 88 Civ. 41733, 1990 WL 41733, at *2 (S.D.N.Y. Apr. 4, 1990)(Lowe, J.)(judgment not vacated where defendant had, among other actions, transferred assets to a related corporation in violation of parties' agreement); *SDI Capital Resources v. 48–50 9th Operating, Inc.,* No. 98 Civ. 3784, 1998 WL 512961, at *2 (S.D.N.Y. Aug. 18, 1998)(Martin, J.)(finding prejudice where plaintiff alleged that defendant had begun to remove assets from the state).

V. *Conclusion*

In sum, even though the Defendants' default was not wilful, they have failed to establish a meritorious defense or counterclaim or that State Street would not be prejudiced. Accordingly, the Defendants' motion to vacate the default judgment should be denied.

VI. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Robert L. Carter, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Carter. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

August 15, 2002.